#28789-a-PJD
**2019 S.D. 61**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JONATHAN JEROME PACKARD,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON SOGN
Judge

\* \* \* \*

BEAU J. BLOUIN
CHRISTOPHER MILES of
Minnehaha County Public
   Defender's Office
Sioux Falls, South Dakota                    Attorneys for defendant
                        and appellant.


JASON R. RAVNSBORG
Attorney General

GRANT FLYNN
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                        and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS ON
AUGUST 26, 2019
OPINION FILED **11/13/19**

#28789

DEVANEY, Justice

[¶1.] Jonathan Packard appeals his convictions for second-degree rape and simple assault. He alleges that the circuit court should have granted a mistrial after one of the prospective jurors—a law enforcement officer—arrived in full uniform, and in response to a question, indicated that he knew Packard. He further alleges that the circuit court erred when it admitted a narrative report prepared by an emergency room nurse summarizing the victim's oral statements made during a sexual assault examination. We affirm.

**Factual and Procedural Background**

[¶2.] On the evening of September 30, 2015, S.S., her mother, and her neighbor (Charles) were sitting around a fire pit in her mother's driveway consuming alcoholic beverages. Around midnight, after S.S.'s mother had gone inside her home for the night, two men were walking by the driveway. Charles and S.S. were still sitting by the fire, and the two men stopped to talk to them. Neither S.S. nor Charles knew either man. S.S. described one man as shorter and more talkative, while the other was tall and did not speak. The shorter man asked Charles for a cigarette and struck up a conversation. Charles eventually asked the two men to leave, and they complied.

[¶3.] Charles and S.S. continued to sit around the fire until between 2:00 and 3:00 a.m. when Charles went inside his home. After Charles left, S.S. poured water on the fire, disposed of the wood, and took the fire pit inside her mother's garage. While S.S. was still inside the garage, but at some unknown point, she awoke finding herself face down on her stomach on the garage floor. She could not

recall how she ended up there. However, she believed she had gotten hit on the head because the last thing she remembered was looking at the lock on the garage, and she had not yet closed the garage door. When she woke up, the garage door was closed, and she could feel that she was lying in kitty litter remnants and oil residue. She could also feel that her pants and underwear were being pulled down, and a man was lying on top of her. S.S. explained that she felt the full weight of his body and smelled a strong odor of alcohol coming from him.

[¶4.]     S.S. did not fight against the man as he laid on top of her because she was worried that the situation would become worse. After he penetrated S.S.'s vagina with his penis, he flipped her onto her back and continued to penetrate her. S.S. believed he had ejaculated. After he stood up, S.S. also stood up, pulled up her pants, and opened the garage door. With the garage door open, S.S. recognized that her attacker was one of the men—the taller, quieter one—that had stopped by the fire when she and Charles were still in the driveway. She told him to leave, but according to S.S., he seemed confused about her request. When she reiterated that he must leave, the man left the garage.

[¶5.]     S.S. then closed and locked the garage door and ran into her mother's home where she cleaned the kitty litter and grease off her face and hair. S.S. did not shower; rather, she fell asleep on the living room floor. Later the next day, S.S. told her parents about the rape. She did not want to call law enforcement because she was embarrassed and ashamed. She was worried that people would judge her because she is Native American and would try to "make it [her] fault."

[¶6.]     S.S. noted that she had a big knot on the left side of her head and was really sore. She went to the emergency room around 4:00 or 5:00 p.m. and was initially examined by an emergency room nurse. The nurse, Erin Stansbury, obtained S.S.'s general health history and determined whether any injuries currently needed treatment. Thereafter, Stansbury completed a Sexual Assault Nurse Evaluation (SANE) note, which is the form used by the hospital for a sexual assault interview. Stansbury explained that her interview for the SANE note generally includes "specific questions about different types of possible injuries, were they hit, kicked anywhere, whether or not there was vaginal penetration, [or] anal penetration[.]" Stansbury testified that she also asks victims to describe "exactly what happened in their words." Both the nurse and the treating doctor use the information in the SANE note to determine what evidentiary samples to collect from the victim.

[¶7.]     During her interview of S.S., Stansbury recorded, among other things, a description of S.S.'s assailant and S.S.'s account of the assault. After completing the interview, Stansbury and Dr. Beth Ellen Lapka obtained buccal, vaginal, and cervical swabs from S.S. The swabs were later tested by the South Dakota State Health Laboratory. This testing confirmed the presence of semen on the vaginal and cervical swabs. DNA testing confirmed that the semen originated from Jonathan Packard.

[¶8.]     Law enforcement interviewed Packard. He denied knowing S.S. and denied having sex with her. He persisted in his denial despite being informed of the DNA evidence. Packard was arrested and charged by indictment with one count of

second-degree rape and four counts of simple assault. The State also filed a part II information, alleging Packard to be a habitual offender. Packard pled not guilty, and a jury trial was held on September 25–27, 2017.

[¶9.]     During voir dire, the circuit court asked prospective jurors whether anyone knew Packard. Prospective juror Schulz—a police officer appearing in full uniform—replied, "I do." The court asked Officer Schulz to state his occupation, and he explained that he was a police officer with the City of Sioux Falls. The court also asked Officer Schulz how long he had been an officer, and he replied that he had been an officer for fifteen years. Finally, the court asked Officer Schulz whether, based on his "past experience as a police officer," he believed "this probably isn't the right case, kind of case for [him] to be sitting on[.]" Officer Schulz responded, "I think I would agree with that." The court dismissed Officer Schulz without objection from either party. Thereafter, Packard requested a mistrial, arguing that Officer Schulz's statements tainted the jury pool. The court denied the motion.

[¶10.]     During the trial testimony from Stansbury, the emergency room nurse, the State sought to admit the SANE note she had prepared during her interview of S.S. Packard objected, and a discussion was held off the record. Thereafter, Packard objected on the record, asserting that the exhibit lacked foundation. The court overruled the objection and admitted the SANE note. During her testimony, Stansbury explained the process she used to complete the SANE note and the SANE kit. She also testified regarding the consent form signed by S.S. prior to the examination. On this consent form, S.S. indicated that she understood she was not

participating in a routine medical checkup, but rather, a sexual assault evidentiary examination.

[¶11.]     During a trial recess, Packard asked the court to revisit his previous objection to the admission of the SANE note raised earlier during the sidebar discussion between counsel and the court. Defense counsel related that during the sidebar, his objection was "to portions of that document that contained - - specifically, the portions that contained the description of Mr. Packard." Counsel renewed this objection and argued that such information was hearsay and did not meet any exception. The court overruled this objection but requested a copy of the report, explaining that the court would review it "[s]o if there's anything we need to redact, we can still do it." The SANE note was ultimately admitted in its entirety, with the exception of one redaction not at issue in this appeal.

[¶12.]     At the conclusion of the trial, the jury found Packard guilty of second-degree rape and simple assault. Packard appeals, asserting the circuit court erred in denying his motion for a mistrial and in admitting the sexual assault examination note.

### Standard of Review

[¶13.]     We review a denial of a motion for a mistrial for an abuse of discretion. *State v. Buchhold*, 2007 S.D. 15, ¶ 17, 727 N.W.2d 816, 821. We likewise review the decision to admit evidence pursuant to the hearsay exception in SDCL 19-19-803(4) for an abuse of discretion. *State v. Roach*, 2012 S.D. 91, ¶ 26, 825 N.W.2d 258, 266.

**Analysis and Decision**

*Voir Dire—Officer Schulz's comment*

[¶14.]　　　　Packard argues that the circuit court erred in denying his request for a mistrial after Officer Schulz's comment purportedly tainted the jury pool.  Packard points out that Officer Schulz arrived for jury duty in his full uniform.  He then faults the circuit court for not addressing the officer's familiarity with Packard outside the presence of the other prospective jurors.  Packard deems insignificant the fact that Officer Schulz did not specify how he knew Packard.  Rather, to Packard, "the implication was clear," and "[t]he default assumption by prospective jurors must have been that Officer Schulz was familiar with Packard due to his prior encounters with the criminal justice system."  Packard further claims that Officer Schulz's comment prejudiced him "because he is a Native American male with tattoos on his face[.]"

[¶15.]　　　　The United States Constitution and the South Dakota Constitution guarantee the right to an impartial jury.  U.S. Const. amend. VI; S.D. Const. art. VI, § 7.  This means in part that "the minds of the jurors [should] be without bias or prejudice[.]"  *State v. Dillon*, 2010 S.D. 72, ¶ 32, 788 N.W.2d 360, 370 (quoting *State v. Belt*, 79 S.D. 324, 328, 111 N.W.2d 588, 589 (1961)).  However, when bias is alleged to exist, "[t]here should be an actual showing of prejudice before a mistrial is granted."  *State v. Garnett*, 488 N.W.2d 695, 698 (S.D. 1992).  Prejudice arises when an error "which, in all probability, [] produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it."  *State v. Williams*, 2008 S.D. 29, ¶ 14, 748 N.W.2d 435, 440 (citation omitted).

[¶16.] From our review of the record, Packard has failed to show that he was prejudiced from Officer Schulz's comment. Although Officer Schulz reported for jury duty in full uniform and stated that he knew Packard, he did not explain how he knew him, and the circuit court intentionally refrained from asking that question. Moreover, the court instructed the jury prior to selection about the presumption of innocence and the State's burden of proof. Notably, the court invited defense counsel to propose "any instructions they wish" related to "that particular juror knowing Mr. Packard[,]" and counsel did not propose such an instruction.

[¶17.] In upholding the court's denial of a mistrial in a juror comment case, we observed that the prospective juror's comments "were, at best, vague." *Garnett*, 488 N.W.2d at 698. The same can be said for Officer Schulz's comment here. He did not expand on his knowledge of Packard or relate anything that suggested his knowledge arose from his work as a police officer or from the current charges against Packard. "Perhaps most important, voir dire continued" and Packard's "counsel had the opportunity to question the prospective jurors to discover any prejudice." *See id.* Therefore, the court did not err in denying Packard's motion for a mistrial.

*Admission of the SANE note*

[¶18.] Packard next contends that the circuit court erred when it admitted the sexual assault examination note because it contained hearsay statements unrelated to medical diagnosis and treatment. The hearsay statements, Packard claims, include S.S.'s description of her assailant and information related to the

timing and location of events. According to Packard, he was prejudiced by the admission of these statements because they "largely served to improperly bolster [S.S.'s] trial testimony of the details of the alleged incident."

[¶19.] The circuit court admitted the hearsay statements in the SANE note under the exception provided by SDCL 19-19-803(4). Under that subsection, a statement made for medical diagnosis and treatment is not excluded by the rule of hearsay if the statement: "(A) Is made for--and is reasonably pertinent to--medical diagnosis or treatment; and (B) Describes medical history; past or present symptoms or sensations; their inception; or their general cause." *Id.*

[¶20.] Notably, Packard's appellate argument differs from that presented to the circuit court. On appeal, he contends the circuit court erred in admitting the *entire* report. But when making his record at trial of what had transpired during the sidebar conference, Packard only objected to the admission of statements that described the assailant. Although this Court may decline to review this broader objection now raised on appeal, *see Roach*, 2012 S.D. 91, ¶ 27, 825 N.W.2d at 266 (treating a failure to object at trial as a waiver of the issue), Packard did object to at least the portion of the SANE note relating to identity. Moreover, because statements pertaining to identity are often relayed in the midst of explaining what occurred during an assault, this case presents the opportunity to address the parameters of SDCL 19-19-803(4) as applied to statements made in these types of medical examinations.

[¶21.] We begin with the premise that a victim's participation in a sexual assault examination does not perforce mean that the victim's statements are being

made solely "to construct a criminal case against" the perpetrator. *See Olesen v. Class*, 962 F. Supp. 1556, 1568 (D.S.D. 1997), *aff'd in part, rev'd in part*, 164 F.3d 1096 (8th Cir. 1999). Rather, statements made by the victim during a sexual assault examination can serve a dual purpose. "[T]he critical inquiry is whether the statement was reasonably pertinent to medical diagnosis or treatment." *State v. Abdo*, 2018 S.D. 34, ¶ 30, 911 N.W.2d 738, 746. To determine whether out-of-court statements were reasonably pertinent to medical diagnosis or treatment, courts utilize a two-part test. *Id.* (quoting *United States v. Renville*, 779 F.2d 430, 436 (8th Cir. 1985)); *accord Lovejoy v. United States*, 92 F.3d 628, 632 (8th Cir. 1996). "[F]irst, the declarant's motive in making the statement must be consistent with the purpose of promoting treatment; and second, the content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." *Abdo*, 2018 S.D. 34, ¶ 30, 911 N.W.2d at 746 (quoting *Renville*, 779 F.2d at 436).

[¶22.] Applying the two-part test here, at least some of the information contained in the SANE note was made for the purpose of promoting treatment and is of the type reasonably relied upon by a physician in treatment or diagnosis. This is true even though evidence presented at trial suggests that the SANE note itself may not have been for the purpose of promoting treatment or diagnosis. For example, prior to her sexual assault examination, S.S. completed a consent form. In that form, S.S. initialed a checklist acknowledging that she was not participating in "a routine medical checkup but a sexual assault *evidentiary* exam." (Emphasis added.) Similarly, Dr. Lapka testified at trial that a sexual assault forensic

examination "is essentially separate from the medical examinations [she] would perform every day on any given patient."

[¶23.] Nonetheless, the emergency room doctor and nurse both explained that their examinations include not only the collection of evidentiary samples, but also an assessment to make sure the patient is medically safe and to address any concerning injuries or medical issues for which the patient may need additional examination or treatment. Stansbury further testified that information contained in the SANE note is also contained within the doctor's medical notes and maintained as part of the patient's chart. Therefore, the statements contained in the SANE note that relate to information typically provided by a patient seeking medical care and reasonably relied upon for treatment or diagnosis are admissible under SDCL 19-19-803(4).

[¶24.] As for the specific statements in the SANE note admitted here, we note that the statements relate S.S.'s narrative account in which she described the assailant, how she was attacked and penetrated, and what occurred and what was said after the attack. This narrative account contains, in relevant part, the following hearsay statements:

> Assailant was Native American, short hair, with flat billed hat, a tattoo on his neck, white bumps on his face, thin, approximately 5'10" and maybe 25 years old. . . . Patient is unsure where the assailant came from. The next thing the patient remembers is waking up on the cement garage floor on her stomach with the garage door closed and the assailant was on top of her back with her pants and underwear down. Patient was being vaginally penetrated with the assailant's penis and thinks the assailant ejaculated vaginally. Patient thinks the assault lasted about 10 minutes. When the assailant was done patient started to stand up and assailant pushed patient back down. Patient continued to get up, opened the garage door and

told him he needed to leave. Patient said assailant made a comment "You aren't even going to give me a place to stay tonight?". Patient replied, "No, you need to go now." and assailant left.

[¶25.] From our review, S.S.'s statements describing the manner in which she was assaulted are of the type reasonably pertinent to medical diagnosis or treatment. We recognize that these statements could assist in a subsequent prosecution. But they also reasonably relate to diagnosis and treatment of medical or psychological issues for which a sexual assault victim would be motivated to seek treatment. In particular, S.S.'s statements allowed her provider to ascertain what type of follow-up treatment was needed, such as X-rays or CT scans or further testing for a concussion, STD testing, or pregnancy testing at some later point in time. The statements also informed her provider on whether counseling was needed to address her psychological well-being. In fact, S.S. testified that she was given medicine for STDs and that counselors came to talk to her.

[¶26.] However, the circuit court erred in admitting S.S.'s statements describing her assailant under SDCL 19-19-803(4). Unlike cases involving a child abuse victim, in which courts have held that statements identifying the abuser may be reasonably pertinent to treatment, S.S.'s description of her assailant, given the circumstances of the assault here, was not the type of information typically relied upon in treatment and diagnosis.[1] Thus, in this case, S.S.'s description of her

---

1.  *See, e.g.*, *Renville*, 779 F.2d at 438 ("statements of identity to a physician by a child sexually abused by a family member are of a type physicians reasonably rely on in composing a diagnosis and course of treatment"); *State v. Orelup*, 492 N.W.2d 101, 105–06 (S.D. 1992) (admitting child victim's statements identifying the child's father as the perpetrator of abuse).

assailant was given and obtained for the purpose of a potential criminal prosecution. We likewise conclude that S.S.'s statements describing what occurred and what was said *after* the attack were not reasonably pertinent to treatment given the facts in this case and were not admissible under SDCL 19-19-803(4). Thus, the circuit court should have, prior to admission, required redaction of these portions of the SANE note.

[¶27.] The circuit court's error in admitting these statements, however, was harmless.[2] To establish reversible error, "a defendant must prove not only that the trial court abused its discretion in admitting the evidence, but also that the admission resulted in prejudice." *State v. Lassiter*, 2005 S.D. 8, ¶ 13, 692 N.W.2d 171, 175. "Error is prejudicial when, 'in all probability . . . [it] produced some effect upon the final result and affected rights of the party assigning it.'" *Novak v. McEldowney*, 2002 S.D. 162, ¶ 7, 655 N.W.2d 909, 912 (quoting *State v. Smith*, 1999 S.D. 83, ¶ 39, 599 N.W.2d 344, 353).

[¶28.] Packard does not identify any prejudice resulting from the admission of the report in its entirety. He contends only that he suffered prejudice because the admission of the portion of the SANE note detailing the incident bolstered S.S.'s trial testimony. But the manner of her assault was not factually in dispute, and her

---

2. While the State did not argue that the statements at issue were not hearsay under SDCL 19-19-801(d)(1)(C), this statute may allow prior statements describing an assailant to be admitted if the declarant testifies and is subject to cross-examination about such prior statements identifying "a person as someone the declarant perceived earlier." Likewise, such a statement may be admitted if it "[i]s consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying[.]" SDCL 19-19-801(d)(1)(B).

description of these details was admissible. As to the identity of S.S.'s assailant, the DNA evidence confirmed that Packard was the source of the semen found inside the victim, all of which was properly admitted. Therefore, Packard has not met his burden of demonstrating that the circuit court's error, in all probability, produced some effect upon the final result of the trial. We affirm.

[¶29.] GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER, Justices, concur.