#29116-a-SRJ
**2020 S.D. 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                         Plaintiff and Appellee,

   v.

BRANDON KEITH SNODGRASS,                         Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARK BARNETT
Retired Judge

* * * *

JASON R. RAVNSBORG
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota

ROXANNE HAMMOND
Hughes County State's Attorney
Pierre, South Dakota                         Attorneys for plaintiff
                                             and appellee.


DAVID W. SIEBRASSE
Pierre, South Dakota                         Attorney for defendant
                                             and appellant.

* * * *

CONSIDERED ON BRIEFS
AUGUST 24, 2020
OPINION FILED **11/24/20**

#29116

JENSEN, Justice

[¶1.] A jury convicted Brandon Snodgrass of eight counts of first-degree child rape in violation of SDCL 22-22-1(1) and four counts of sexual contact with a child in violation of SDCL 22-22-7. Snodgrass appeals, arguing the indictment failed to sufficiently allege the dates, times, and locations of the crimes charged so that he could prepare an adequate defense. Snodgrass also claims that the circuit court abused its discretion in admitting certain other act evidence, admitting the child victim's hearsay statements, and overruling his objections that the State's expert opinions improperly vouched for the testimony of the child witness. Finally, Snodgrass argues that the court erred in denying his motion for a judgment of acquittal and by imposing sentences that violated the Eighth Amendment. We affirm.

**Facts and Procedural History**

[¶2.] In 2012, Snodgrass began a long-distance relationship with C.M. C.M.'s daughter, E.M., was three-years-old at the time. Snodgrass lived in Pierre, while C.M. lived in North Dakota and Aberdeen until she finished college in 2014. In May 2014, C.M. located employment in Pierre and moved in with Snodgrass at his parents' home.

[¶3.] Within a few weeks, C.M. rented an apartment for herself, E.M., and Snodgrass, and the three moved in together. C.M. worked full-time while Snodgrass lived with her. Snodgrass worked on and off during their relationship and often watched E.M. when C.M. was working. In 2016, Snodgrass was convicted and incarcerated for possession of a controlled substance.

[¶4.] Prior to Snodgrass's incarceration, E.M. told C.M.'s mother that Snodgrass had inappropriate contact with her. C.M. confronted Snodgrass after learning about E.M.'s claim, but Snodgrass denied any wrongdoing. He explained that he had checked to make sure E.M. cleaned her bottom after E.M. complained that her bottom was itchy and sore. C.M. accepted Snodgrass's explanation at the time.

[¶5.] Snodgrass and C.M. continued their relationship while he was incarcerated. C.M. and E.M. sent letters to Snodgrass and visited him in prison. E.M. said that she missed Snodgrass and looked forward to his return home. Snodgrass moved back into the apartment with C.M. after he was released from prison in September 2017. He began to look after E.M. again and often picked her up after school.

[¶6.] In May 2018, C.M. broke up with Snodgrass after Snodgrass became physical with her when he learned that C.M. had been unfaithful to him. Snodgrass moved out, taking two cell phones and a tablet computer. Snodgrass also took an ottoman that he and C.M. kept in their bedroom. The ottoman contained a large collection of sex toys that he and C.M. had used during their relationship. Snodgrass asked C.M. several times during the summer after they had broken up if he could see or talk to E.M. E.M. was out-of-town visiting her biological father for half of the summer. C.M. denied the requests.

[¶7.] On September 5, 2018, E.M. walked into the kitchen after taking a shower and disclosed to C.M. that Snodgrass had "molested" her. E.M. did not provide many details, but she told C.M. that Snodgrass had touched her "privates"

with his hands, his mouth, and his "privates." C.M. immediately contacted law enforcement. Law enforcement scheduled a forensic interview for E.M. the next day with the Central South Dakota Child Assessment Center. Angela Lisburg, a nurse practitioner at the Assessment Center, conducted a physical examination and interview of E.M.

[¶8.]     E.M. told Lisburg that the sexual abuse began when she was in kindergarten and continued regularly while Snodgrass was living with C.M. E.M. recalled that the first instance of abuse occurred when Snodgrass used a vibrator to touch her vaginal area inside her underwear. Thereafter, Snodgrass began to use his fingers, his mouth, his penis, and various sex toys to touch and penetrate E.M. vaginally. E.M. described the sex toys in detail. She also described how it felt when Snodgrass abused her. E.M. explained that the abuse occurred most frequently after Snodgrass picked her up from school and when she and Snodgrass were watching tv in the living room while C.M. slept in the bedroom. E.M. also stated that these acts typically occurred on the couch, on a mattress that E.M. slept on in the living room, or on C.M.'s bed.

[¶9.]     In describing the abuse, E.M. said that "white stuff" would come out of Snodgrass's "private part." She said that it would either go inside of her or on a towel that Snodgrass put underneath them. Snodgrass told E.M. that "clear stuff" would come out of her if she liked what he was doing. E.M. also reported that Snodgrass put an "aloe" lotion on her privates, so it would be easier for him to "go inside of her." E.M. told Lisburg that Snodgrass had torn her "private part" once. She explained she knew about the injury because there was blood on the toilet

paper when she wiped herself, and it hurt for several days afterward. When E.M. told Snodgrass about the injury, he told her that she should make up a story if anyone asked about it. E.M. also told Lisburg that Snodgrass threatened to hurt E.M. or people she loved if she told anyone about what he was doing.

[¶10.] Lisburg conducted a physical examination of E.M., which included her external genitalia. The exam was normal, showed no signs of scarring, and revealed that E.M.'s hymen was intact. Lisburg concluded that the physical examination did not confirm or exclude the possibility that E.M. had been sexually abused.

[¶11.] After Lisburg interviewed E.M., law enforcement went to the apartment to collect evidence. At this time, C.M. gave law enforcement a bottle of lubricant that she found underneath a couch cushion a few weeks before E.M. reported the abuse. C.M. found it when she moved the couch out of the apartment to make room for a new couch. C.M. did not think much about the lubricant when she found it, but she thought it was "odd that it was in the couch."

[¶12.] Law enforcement also obtained a search warrant for Snodgrass's parents' home, where Snodgrass had been staying after he moved out of C.M.'s apartment. Law enforcement retrieved Snodgrass's two cell phones and his Samsung tablet during the search. The ottoman containing a large assortment of sex toys was also located in the basement room where Snodgrass was staying. E.M. later identified nine toys from the ottoman that Snodgrass had used to abuse her. These nine toys were sent to the State Crime Laboratory. Several of the toys contained DNA from more than one contributor, but there was an insufficient

sample to identify each contributor. However, laboratory analysis confirmed that DNA from both C.M. and E.M. was on the tip of one of the sex toys. At trial, the laboratory analyst explained that the samples she tested would likely have come from touch DNA, saliva, or vaginal fluid. The analyst further explained that her forensic tests could not differentiate between touch DNA and vaginal fluid.

[¶13.] Snodgrass was arrested on September 11, 2018. A week later, he was indicted by a Hughes County grand jury on eight counts of first-degree rape and four counts of sexual contact with a child under age sixteen. The State alleged that four of the first-degree rape charges occurred from May 28, 2014 to July 4, 2016. The indictment alleged the other four rapes occurred from September 14, 2017 to May 25, 2018, after Snodgrass's release from prison. The indictment alleged one count of digital penetration, one count of penile penetration, one count of oral penetration, and one count of penetration with an object during each time period. The four sexual contact counts pertained to the State's allegation that Snodgrass used a vibrator on E.M. The indictment alleged two of the counts occurred before Snodgrass's incarceration, and two of the counts occurred after his release. The State also filed a part II habitual offender information alleging that Snodgrass had previously been convicted of three felonies.

[¶14.] At a pretrial hearing, the State sought permission, under SDCL 19-19-404(b), to introduce data found on Snodgrass's electronic devices. This other act evidence included "extraction reports" from each device showing pornographic search terms and internet histories created on the devices from April to September 2018. The State argued that some of the search terms and web histories were

relevant to intent, motive, and lack of mistake because they demonstrated Snodgrass's sexual interest in young girls.[1] The State argued that other searches and web histories were relevant to show pattern and intent because they involved many of the same acts of abuse that E.M. reported.[2]

[¶15.] Additionally, the State sought to introduce several pornographic images found on the three devices, most of which were images of prepubescent girls. The State also sought to offer three photos of E.M. wearing only her underwear, in which E.M. was lying on a mattress and on the living room couch. Snodgrass's tattooed feet are visible in two of these photos, suggesting that Snodgrass took them. In a fourth photo, taken just minutes after a photo of E.M. on the mattress, there are three sex toys on the mattress near where E.M. had been lying. E.M. separately identified all three of the sex toys as devices that Snodgrass had used to sexually abuse her. The circuit court ruled, over Snodgrass's objection, that the entirety of the extraction reports and the images were admissible as other act evidence under Rule 404(b).

[¶16.] At another pretrial hearing, the circuit court considered the State's notice of intent to offer hearsay statements of E.M. This evidence included

---

1. Examples of these searches and histories included terms such as "young teen booty," "young pussy," "young booty shake," "tiny teen," "petite teen," "little girl twerking," and "tiny pornstar."

2. These search terms and web histories included descriptions of sex acts and incestuous acts with young girls, such as "my stepdad made me squirt," "stretching out a tiny girl's pussy with a big ass dildo," "cheating husband fucks stepdaughter while wife sleeps," "small girl squirts when a huge cock stuff her tiny pussy," "stepdad cums inside tiny step daughter," and "am I too young to squirt."

statements made by E.M. when she first reported the abuse to C.M. and E.M.'s statements to Lisburg at the Assessment Center. The court determined that both statements bore sufficient indicia of reliability and were admissible under SDCL 19-19-806.1.

[¶17.] Snodgrass also filed motion for a bill of particulars, or alternatively, an order quashing the indictment prior to trial. Snodgrass argued that he was entitled to more specific dates, times, and locations for the alleged rapes so that he could adequately prepare a defense and present alibi witnesses. Further, Snodgrass claimed that he was entitled to more specificity concerning the sexual contact charges and that at least two of the sexual contact charges were duplicitous because they alleged that the same acts occurred during the same timeframe. The State argued that it was unable, and not required, to provide additional details. However, the State agreed to conduct a "lineup" of the sex toys so that E.M. could identify the devices that she claimed Snodgrass used. The circuit court otherwise denied Snodgrass's motion.

[¶18.] A jury trial commenced on May 28, 2019. E.M. testified consistently with the statements that she made during the Lisburg interview. Snodgrass cross-examined E.M. concerning alleged inconsistencies from these earlier statements. Both sides also presented conflicting expert testimony regarding the significance of the medical examination findings. At the conclusion of the evidence, the circuit

court denied Snodgrass's motion challenging the sufficiency of the evidence for each of the charges.[3] The jury found Snodgrass guilty on all twelve counts.

[¶19.] Snodgrass consented to a court trial on the habitual offender information. The court sustained the part II information, which enhanced the possible sentences on each sexual contact conviction up to fifty years, but did not enhance the first-degree rape convictions, which each carried a maximum sentence of life in prison. A sentencing hearing was held on August 9, 2019. The court imposed a twenty-year penitentiary sentence for the rape conviction in Count 1, ten-year consecutive sentences on each of the rape convictions in Counts 2 through 8, and four fifteen-year sentences, with five years suspended, on each sexual contact conviction. The sentences for sexual contact were imposed consecutive to the rape convictions, but concurrent to one another. Snodgrass appeals, raising six issues.

## Analysis and Decision

### 1. Whether the circuit court erred in denying the motion for a bill of particulars and the motion to quash the indictment.

[¶20.] The denial of a motion for a bill of particulars is reviewed for an abuse of discretion. *In re V. D. D.*, 278 N.W.2d 194, 196 (S.D. 1979). "Whether an indictment is sufficient is a question of law reviewed de novo." *State v. Fisher*, 2013 S.D. 23, ¶ 28, 828 N.W.2d 795, 803. Likewise, we review Snodgrass's claim that the

---

3. Snodgrass referred to the motion both at trial and in his appellate brief as a motion for a directed verdict, but motions for a direct verdict are abolished and should be presented as motions for judgment of acquittal. SDCL 23A-23-1.

indictment's imprecision violated his due process rights de novo. *State v. Medicine Eagle*, 2013 S.D. 60, ¶ 27, 835 N.W.2d 886, 896.

[¶21.] "The purpose of an Indictment or Information is to apprise a defendant of the nature of the charges against him with sufficient specificity so that he may defend against the charges and may later plead the Indictment or Information as a bar to a subsequent charge." *State v. Satter*, 1996 S.D. 9, ¶ 12, 543 N.W.2d 249, 251. Accordingly, one of the five statutory requirements for an indictment or information is "[t]hat the offense charged is designated in such a manner as to enable a person of common understanding to know what is intended." SDCL 23A-6-7(5).

[¶22.] Snodgrass argues that the indictment was insufficient under SDCL 23A-6-7(5) and violated his due process rights because it failed to allege specific times and dates for each charge. However, "[t]he precise time at which an offense was committed need not be stated in an indictment or information, but it may be alleged to have been committed at any time before the filing thereof, except when the time is a material element of the offense." SDCL 23A-6-9. "We have previously held in cases of sexual abuse of minors that time is not a material element of the offense." *State v. Darby*, 1996 S.D. 127, ¶ 10, 556 N.W.2d 311, 316. *See also State v. Floody*, 481 N.W.2d 242, 247 (S.D. 1992) ("[T]he nature of sex offenses involving minor children often precludes certainty with respect to time, especially where reporting of the incident is delayed."); *State v. Basker*, 468 N.W.2d 413, 417 (S.D. 1991) ("Although an information should be as specific as possible with respect to time, it is not always possible to know with certainty when an offense occurred.

This is especially true in sexual molestation cases involving a minor victim who does not immediately complain to authorities.").

[¶23.] Snodgrass's due process arguments challenging the adequacy of the rape and sexual contact allegations in the indictment are also unpersuasive. In *State v. Hernandez*, an indictment alleged multiple counts of first-degree child rape that merely recited the statutory elements for the crime and alleged that the rapes occurred during two time periods: an eight-month period and a thirteen-month period. 2016 S.D. 5, ¶¶ 3-4, 874 N.W.2d 493, 496. Relying on *Russell v. United States*, 369 U.S. 749, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962), *Hernandez* determined that referencing the time period when each crime allegedly occurred and the crime's statutory elements were sufficient to satisfy due process. *Id.* ¶ 40. The Court explained that an indictment provided sufficient notice of a first-degree rape charge when "Each count identified (1) the elements of the specific offense [rape or sexual contact], (2) the correlating statute [SDCL 22–22–1 or SDCL 22–22–7], (3) the county of the offense . . . , (4) the victim of the offense . . . , and (5) the period in which the alleged offense occurred." *Id.*

[¶24.] Here, the indictment satisfied the requirements of *Hernandez* but also described how each alleged act of sexual penetration and sexual contact occurred.[4] Additionally, the State provided Snodgrass with the detailed forensic interview of E.M. at the Assessment Center, which was conducted the day after E.M. reported

---

4. Although Snodgrass does not claim on appeal that any of the counts of the indictment were duplicitous, the circuit court gave an unanimity instruction that required all twelve jurors to unanimously agree on Snodgrass's guilt for each alleged act of sexual penetration and sexual contact. *See State v. Brende*, 2013 S.D. 56, ¶ 13, 835 N.W.2d 131, 138.

the sexual abuse. Further, E.M. identified each sex toy that she claimed Snodgrass used to sexually abuse her. The circuit court did not err in denying the motion for bill of particulars and the motion to quash the indictment.

> ### 2. Whether the circuit court abused its discretion in admitting the internet searches and images on Snodgrass's cell phones and tablet.

[¶25.] "We presume evidentiary rulings made by a trial court are correct, and review those rulings under an abuse of discretion standard." *State v. Fool Bull*, 2008 S.D. 11, ¶ 10, 745 N.W.2d 380, 385. "An abuse of discretion is discretion exercised to an end or purpose not justified by and clearly against, reason and evidence." *Medicine Eagle*, 2013 S.D. 60, ¶ 16, 835 N.W.2d at 892.

[¶26.] Evidence of other acts by a defendant are not admissible to prove a defendant's character but is admissible if admitted for other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." SDCL 19-19-404(b)(2). "If the other act evidence is admissible for any purpose other than simply character, then its use is sustainable. All that is prohibited under § 404(b) is that similar act evidence not be admitted solely to prove character." *State v. Phillips*, 2018 S.D. 2, ¶ 14, 906 N.W.2d 411, 415.

[¶27.] Before admitting other act evidence, the court must determine on the record that the evidence is (1) "relevant to a material issue in the case" and (2) the "probative value of the evidence is [not] substantially outweighed by its prejudicial effect." *State v. Dubois*, 2008 S.D. 15, ¶ 20, 746 N.W.2d 197, 205. "Evidence is relevant if (a) It has any tendency to make a fact more or less probable than it would be without the evidence; and (b) The fact is of consequence in determining the action." SDCL 19-19-401. "Evidence is unduly prejudicial if it persuades the jury in

an unfair or illegitimate manner, but not merely because it harms the other party's case." *State v. Bowker*, 2008 S.D. 61, ¶ 41, 754 N.W.2d 56, 69. Additionally, the State must present sufficient evidence for a jury to conclude by a preponderance of the evidence "that the other acts occurred and that the defendant was the actor." *Phillips*, 2018 S.D. 2, ¶ 20, 906 N.W.2d at 417.

[¶28.] The circuit court admitted three extraction reports containing web searches and histories that were found on Snodgrass's three devices. The court also admitted several pornographic images found on these devices. It held that the web searches and histories, as well as the images, showed a "dedicated and persistent interest in underage females" and were relevant to Snodgrass's "pattern, common plan, or scheme, and intent" to engage in sexual activity with underage girls.

[¶29.] The court separately addressed some of the searches and histories involving specific acts that E.M. alleged against Snodgrass. It held these searches were relevant to motive, intent, plan, preparation, knowledge, lack of accident, and identity. The court found this evidence "demonstrate[s] a pattern of obsession with interfamily sex, sisters, brothers, stepdaughters, [and] stepdads, which is our charge here." The court also held that the numerous searches for sexual acts involving a "dildo" were relevant to show lack of accident because they "help define, or at least infer . . . how [E.M.'s] DNA [got] on the dildo."[5]

[¶30.] The circuit court then turned to address the question of prejudice. It determined that "weighing and balancing [of the search and image evidence] tips

---

5. Snodgrass had suggested to law enforcement that E.M.'s DNA should not be on any of the sex toys unless she had gotten into the ottoman hidden in the closet of the bedroom and touched the toys.

solidly in favor of admission." The court noted that many of the search terms and images were "extremely prejudicial" to Snodgrass because they were "highly probative" and "go straight to the heart of relevancy to the charges." However, the court found Snodgrass could not demonstrate that the evidence would persuade the jury in an unfair or illegitimate manner. The circuit court therefore concluded that none of the internet searches or images were unfairly prejudicial because their probative value was not substantially outweighed by the danger of unfair prejudice.

[¶31.] Snodgrass claims that the searches and images were not probative to any issues in the case because most of the searches were dated after the abuse allegedly occurred. He also argues that this evidence was not relevant because some of the searches and images were of teens, while E.M. was between five- and nine-years-old when the sexual abuse allegedly occurred. Snodgrass asserts that the web searches and images were classic character evidence, and any probative value was substantially outweighed by the danger of unfair prejudice because the evidence "painted [Snodgrass] as some type of deviant interested in child pornography."[6]

[¶32.] The State's other act evidence did not lack probative value merely because some of the web searches were conducted after Snodgrass moved out of the apartment. We have previously held that other act evidence that occurs after the charged offense may be relevant "to prove a common plan or scheme." *State v.*

---

6. Snodgrass does not specifically challenge the admission of the photos of E.M. on his phone. It is not apparent that these images are other act evidence. Regardless, we conclude that the circuit court properly exercised its discretion in admitting these images. *See State v. Thomas*, 2019 S.D. 1, ¶ 24 n.5, 922 N.W.2d 9, 16 n.5.

*Thomas*, 2019 S.D. 1, ¶ 23, 922 N.W.2d 9, 16.  The searches and images found on the three devices were dated between April 21 and August 24, 2018.  Snodgrass allegedly abused E.M. until he moved out of the apartment in May 2018.  The evidence was probative to the charges because of its proximity to the period of alleged abuse.  Further, Snodgrass continued to ask to see E.M. during the summer of 2018 after he moved out.

[¶33.]     Additionally, the searches, web histories, and most of the images were highly probative to E.M.'s allegations.  For instance, searches and images associated with sexual acts between a stepdad and stepdaughter and the use of a dildo on young girls were probative to common plan, intent, and motive to sexually abuse E.M.  Further, as noted by the circuit court, several of the lewd images unquestionably showed very young girls.  This evidence undercut Snodgrass's denial of sexual abuse and his defense that any inappropriate contact with E.M. was accidental.  The circuit court did not abuse its discretion in admitting the extraction reports and lewd images of underage girls.

[¶34.]     Snodgrass generally challenges the probative value and prejudice associated with all the images introduced at trial.  For the reasons discussed above, these challenges are unavailing when applied to images of young girls.  However, three of the images involved older individuals.  One image showed a male who appeared to be penetrating another unknown individual from behind.  The second image was of a nude female who had developed breasts and appeared to be post-pubescent.  The third image was a collage of four unrelated photos.  While three of the photos in the collage appeared to show underage girls, the fourth showed a dog,

an adult female, and an adult male engaging in a sexual act.[7]  In a pretrial hearing,
the court noted that the image of the post-pubescent female might be "getting
outside of 404b."  Yet, it was admitted at trial, along with the other two images,
even though the circuit court did not address the probative value of these images.

[¶35.]	The initial determination of whether the alleged other acts are
probative is a question for the circuit court in the first instance.  *Phillips,* 2018 S.D.
2, ¶ 20, 906 N.W.2d at 417.  *See also Huddleston v. United States*, 485 U.S. 681, 687,
108 S. Ct. 1496, 1500, 99 L. Ed. 2d 771 (1988) ("Preliminary questions concerning . .
. the admissibility of evidence shall be determined by the court[.]").  A court must be
circumspect in its consideration of each act offered by the State under SDCL 19-19-
404(b).  This requires the court to consider the probative value of each act and the
associated prejudice.  *Dubois*, 2008 S.D. 15, ¶ 20, 746 N.W.2d at 205.

[¶36.]	The circuit court failed to enter findings and conclusions addressing
the probative value of the three images that did not involve prepubescent girls.
Further, it is difficult to conceive what probative value the image of the two adults
engaged in an act of bestiality had with respect to E.M.'s claims of child sexual
abuse.  However, even if the court abused its discretion in admitting these images,

---

7.	At trial, the circuit court received a disc into evidence containing all the
	images presented at the pretrial hearing, including these three images.
	However, the entire content on the disc was not published to jury, and the
	record does not reflect whether the jury had an opportunity to view the
	images contained on the disc.  At trial, the State separately introduced and
	published to the jury three partially nude images of E.M. and the photo of
	three sex toys taken approximately at the same time and at the same
	location.  The State also separately introduced and published five of the lewd
	images of unknown individuals.  One of these images was the collage
	containing the photo of two adults and an animal engaged in a sexual act.

Snodgrass must also show how their admission affected the outcome of the trial. *State v. Kvasnicka*, 2013 S.D. 25, ¶ 19, 829 N.W.2d 123, 128. On appellate review, we determine that error is prejudicial when it "in all probability affected the jury's conclusion." *Id.*

[¶37.] Our review of E.M.'s testimony and the other properly admitted evidence leads us to conclude that the error was not prejudicial. E.M.'s testimony was detailed and consistent, and the State presented evidence corroborating her testimony. Further, the internet searches, histories, and pornographic images involving underaged girls, along with the images Snodgrass took of E.M., were properly admitted and probative to Snodgrass's intent and plan to sexually abuse E.M. On this record, Snodgrass has not shown that the admission of three lewd images of adults created prejudicial error.

> ### 3. Whether the circuit court abused its discretion in admitting E.M.'s hearsay statements to C.M. and Lisburg.

[¶38.] We review the circuit court's decision admitting E.M.'s hearsay statements to C.M. and Lisburg for an abuse of discretion. *Floody*, 481 N.W.2d at 250. "An abuse of discretion is discretion exercised to an end or purpose not justified by and clearly against, reason and evidence." *Medicine Eagle*, 2013 S.D. 60, ¶ 16, 835 N.W.2d at 892.

[¶39.] The court admitted both hearsay statements under SDCL 19-19-

806.1,[8] which requires "that the time, content, and circumstances of the statement[s] provide sufficient indicia of reliability[.]"[9] The circuit court found that the hearsay statements bore sufficient indicia of reliability, noting that E.M. was "a very strong witness" who "clearly understands truth from falsehood." The circuit court also considered E.M.'s prior statements to Lisburg and C.M. It noted that E.M. was "oriented to time, place and topic" during the Lisburg interview, and E.M. "tracked all the questions and handled the questions remarkably well." Further, the court found that the Lisburg interview "was not leading and suggestive," E.M. "was not coached," and E.M.'s answers were "internally" and "externally" consistent.

---

8.     SDCL 19-19-806.1 states:

> A statement made by a child under the age of thirteen . . . describing any act of sexual contact or rape performed with or on the child by another, or describing any act of physical abuse or neglect of another child . . . not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant . . . in the courts of this state if:
>
> (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
> (2) The child either:
>     a.     Testifies at the proceedings; or
>     b.     Is unavailable as a witness.

9.     The circuit court also determined that the hearsay statements E.M. made to Lisburg were admissible under SDCL 19-19-803(4) as statements made for medical diagnosis or treatment. The parties disagree whether these hearsay statements were admissible as statements made for medical diagnosis or treatment under SDCL 19-19-803(4). *See State v. Packard*, 2019 S.D. 61, ¶ 23, 935 N.W.2d 804, 811. However, because the hearsay statements were properly admitted under SDCL 19-19-806.1, it is unnecessary to consider the admissibility of the hearsay statements under SDCL 19-19-803(4).

Finally, the court found Lisburg and C.M. to be credible witnesses when testifying to the hearsay statements at the pretrial hearing.

[¶40.] Snodgrass alleges that the circuit court abused its discretion when it admitted E.M.'s hearsay statements to C.M. because C.M. "had significant bias and motivation to lie about [Snodgrass]" after they broke up.[10] Snodgrass further claims that E.M.'s hearsay statements to Lisburg were unreliable because of "the complete lack of corroboration of the allegations." Snodgrass refers to the opinion of his expert that the normal results of E.M.'s vaginal exam were inconsistent with her testimony because "the repeated and violent nature of the alleged abuse would have resulted in E.M. having an exam that revealed a vaginal opening consistent with a sexually active female."

[¶41.] We assess the reliability of a child's hearsay statements by considering the circumstances in which they were made. *See State v. Cates*, 2001 S.D. 99, ¶ 11, 632 N.W.2d 28, 34 (providing a list of nine factors to assess reliability). When assessing the reliability of a child's hearsay statement "[n]o single consideration is dispositive." *Id.* The court "must examine the totality of the circumstances surrounding the statement." *Id.* (citing *Idaho v. Wright*, 497 U.S. 805, 819, 110 S. Ct. 3139, 3148-49, 111 L. Ed. 2d 638 (1990)).

[¶42.] The record supports the circuit court's determination that the hearsay statements were reliable. E.M. gave a detailed and coherent description of the

---

10. To the extent that Snodgrass claims C.M. was biased against him or lacked credibility as a witness, Snodgrass cross-examined C.M. at trial. The credibility of C.M.'s testimony was within "the exclusive province of the jury." *State v. McKinney*, 2005 S.D. 73, ¶ 32, 699 N.W.2d 471, 481.

abuse beginning with her interview at the Assessment Center. A review of her statements and trial testimony also supports the circuit court's finding that E.M. was intelligent and mature for her age. E.M. vividly described the sex acts that occurred, and there was no evidence that her testimony was coached by C.M. or anyone else. There is also no evidence that E.M. had a motive to manufacture the allegations against Snodgrass. In fact, E.M. testified that she loved Snodgrass and missed him at times, but she did not miss the things he had done to her. Several defense witnesses also described the affection and close bond between E.M. and Snodgrass.

[¶43.] Finally, Snodgrass's claim that the statements should have been excluded because of a lack of corroborating evidence fails because E.M. testified at trial, and Snodgrass had the opportunity to cross-examine her. *Cates*, 2001 S.D. 99, ¶ 10 n.6, 632 N.W.2d at 34 n.6. We have consistently held that "[n]o corroboration of abuse is necessary in a case where the child testifies at trial. The corroboration requirement for testifying sex crime victims no longer exists." *Id. See also State v. Guthmiller*, 2003 S.D. 83, ¶ 13, 667 N.W.2d 295, 301. The circuit court did not abuse its discretion when it determined that the statements were admissible under SDCL 19-19-806.1.

### 4. *Whether the State's experts impermissibly vouched for E.M.'s testimony.*

[¶44.] Snodgrass argues that the circuit court erred in overruling his vouching objections to the State's expert testimony. "Decisions to admit or deny evidence are reviewed under the abuse of discretion standard." *State v. Packed*, 2007 S.D. 75, ¶ 17, 736 N.W.2d 851, 856. "An abuse of discretion is discretion

exercised to an end or purpose not justified by and clearly against, reason and evidence." *Medicine Eagle*, 2013 S.D. 60, ¶ 16, 835 N.W.2d at 892.

[¶45.] Improper vouching "invite[s] the jury to rely on the government's assessment that the witness is testifying truthfully." *State v. Goodroad*, 455 N.W.2d 591, 594 (S.D. 1990). The State may not improperly vouch for a witness's credibility by "tell[ing] the jury that [it] has confirmed a witness's credibility before using [the witness]." *Id.* It is "the exclusive province of the jury to determine the credibility of a witness." *State v. McKinney*, 2005 S.D. 73, ¶ 32, 699 N.W.2d 471, 481.

[¶46.] Snodgrass argues that the State's experts used studies and statistics to vouch for E.M.'s allegations. He alleges that the State's experts vouched for E.M. when they testified "to the credibility of [E.M.], delayed reporting, [the] profile of a sexual abuse victim, and how children disclose sexual abuse." Snodgrass further argues that the State attempted to use its expert witnesses as a "back door way of getting testimony from an alleged expert saying that the child fits a 'profile' or displays the 'indicators' of a child sex abuse victim and therefore her testimony is credible."

[¶47.] The State's expert testimony concerning studies and statistics did not improperly vouch for E.M.'s credibility. Experts can "summarize [] medical evidence and express an opinion that the evidence is consistent or inconsistent with the victim's allegations of sexual abuse." *State v. Buchholtz*, 2013 S.D. 96, ¶ 27, 841 N.W.2d 449, 458 (quoting *United States v. Whitted*, 11 F.3d 782, 785 (8th Cir. 1993)). The State's expert physician gave testimony that was "clearly within the

bounds set in prior case law." *Cates*, 2001 S.D. 99, ¶ 19, 632 N.W.2d at 36. The physician discussed scientific literature in the field, including studies and statistics, on the injuries that one would expect to observe based on E.M.'s testimony. He stated that a child's vagina will only show signs of scarring or damage in a small percentage of sexual abuse cases after the tissue has had time to heal. "[Q]ualified experts can inform the jury of characteristics in sexually abused children and describe the characteristics the child exhibits." *Buchholtz*, 2013 S.D. 96, ¶ 29, 841 N.W.2d at 459 (citing *Whitted*, 11 F.3d at 785).

[¶48.]     However, we have cautioned courts to carefully distinguish between expert testimony that helps a jury reach their own determination of credibility and testimony that merely endorses the testimony of another. *Id.* ¶ 28. "[E]xperts cannot pass judgment on a witness's truthfulness in the form of a medical opinion." *Id.* Thus, we have distinguished between expert opinions providing that evidence is "consistent or inconsistent with the victim's allegations of sexual abuse" and impermissible testimony that comments on a child's credibility. *Id.* ¶ 27; *McKinney*, 2005 S.D. 73, ¶ 32, 699 N.W.2d at 481.

[¶49.]     Here, the State asked Lisburg whether she noticed consistencies or inconsistencies in her interview with E.M. Lisburg testified to E.M.'s ability to describe the events in detail, and she described inconsistencies in some of E.M.'s statements. During one line of questioning, Lisburg also testified that some children will say the same phrase repeatedly, but are not able to give details about

what happened to them. Lisburg explained that she has "a high suspicion for coaching or fabrication" in such cases.[11]

[¶50.] Lisburg's explanation of the "red flags" she looks for when trying to determine whether a child has been coached was not improper. "Experts can fairly testify to what types of behaviors might indicate child sexual abuse, give insights through expert evaluation of a witness, and educate jurors on matters that will help them to assess credibility[.]" *Buchholtz*, 2013 S.D. 96, ¶ 31, 841 N.W.2d at 460. "We have always been receptive to the use of expert testimony to help jurors understand issues of behavior, perception, and memory with child witnesses." *Id.* Additionally, contrary to Snodgrass's claim that the State's experts fit E.M. into a profile, Lisburg testified that each child is unique; and there is no typical way an abused child reacts to abuse or reports it. Lisburg also agreed with defense

---

11. After Lisburg testified on the red flags of coaching and fabrication, the State asked Lisburg whether she was concerned about "that" in E.M.'s case. Lisburg responded, "No, I had no concerns." The court overruled Snodgrass's objection to this testimony. The State's inquiry as to whether Lisburg had concerns about coaching or fabrication may have improperly asked Lisburg to give her imprimatur to E.M.'s testimony by implying that E.M.'s testimony was truthful. However, even if this particular question and answer was improper, Snodgrass must show that the circuit court abused its discretion by failing to sustain his objection and that any error was prejudicial. *Kvasnicka*, 2013 S.D. 25, ¶ 19, 829 N.W.2d at 128. "Error is prejudicial when, in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it." *Id.* Significantly, Snodgrass does not specifically highlight this testimony or claim that it was prejudicial. Further, Lisburg's testimony did not amount to a definitive medical diagnosis or opinion that E.M. had been sexually abused to a significant degree of certainty. *See generally Buchholtz*, 2013 S.D. 96, ¶¶ 25, 30, 841 N.W.2d at 459-60 (providing an example of expert diagnosis of child sexual abuse that was prejudicial). Additionally, no party made any reference to this testimony for the remainder of trial, and the statement falls within a robust evidentiary record. We find no prejudice.

counsel's statement on cross-examination that "nobody can determine that a child has been abused just because they act in a certain way." Therefore, the experts' opinions regarding the significance of the physical examination findings and observations from E.M.'s forensic interview did not improperly vouch for E.M.'s testimony.

### 5. Whether the circuit court erred in failing to enter a judgment of acquittal on any of the charges.

[¶51.] "Denial of a motion for judgment of acquittal is reviewed de novo." *State v. Ware*, 2020 S.D. 20, ¶ 12, 942 N.W.2d 269, 272. On review, this Court considers "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "[W]e accept the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict." *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342. "We do not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence on appeal." *Id.*

[¶52.] On the first-degree rape charge, the State was required to prove that Snodgrass committed an act of sexual penetration with E.M. and that E.M. was under the age of thirteen. *See* SDCL 22-22-1. Sexual penetration is defined as "an act, however slight, of sexual intercourse, . . . or any intrusion, however slight, of any part of the body or of any object into the genital or anal openings of another person's body." SDCL 22-22-2. To prove sexual contact with a child, the State was

required to show that Snodgrass "knowingly engage[d] in sexual contact" with E.M.
SDCL 22-22-7.[12]

[¶53.] The jury heard E.M. describe in detail how Snodgrass touched and penetrated her vaginally with his penis, fingers, tongue, and sex toys throughout the time periods he lived with E.M. E.M.'s allegations were generally consistent, and the allegations matched the periods that Snodgrass watched E.M. This evidence was sufficient to support the jury's verdict on the eight rape counts and four counts of sexual contact. *State v. Swan*, 2008 S.D. 58, ¶ 17, 753 N.W.2d 418, 422 ("In South Dakota it is not essential to a sexual offense conviction that the testimony of the victim be corroborated by other evidence."). The State also presented evidence that corroborated E.M.'s testimony, including evidence of E.M.'s DNA on the tip of a sex toy, the partially nude photos of E.M., and the photo of the three sex toys taken within minutes of the partially nude photos of E.M. The circuit court did not err when it denied Snodgrass's motion for a judgment of acquittal.

### 6. Whether Snodgrass's sentences were cruel and unusual in violation of the Eighth Amendment.

[¶54.] Snodgrass challenges what effectively amounts to a life sentence for his convictions of rape and sexual contact. He claims the sentences are grossly disproportionate to the charges and are therefore unconstitutional under the Eighth Amendment. "[W]hen the question presented is whether a challenged sentence is

---

12. SDCL 22-22-7.1 defines sexual contact as "any touching, not amounting to rape, whether or not through clothing or other covering, of the breasts of a female or the genitalia or anus of any person with the intent to arouse or gratify the sexual desire of either party."

cruel and unusual in violation of the Eighth Amendment, we conduct a de novo review." *State v. Chipps*, 2016 S.D. 8, ¶ 31, 874 N.W.2d 475, 486.

[¶55.] We must first determine "whether the sentence imposed is grossly disproportionate to its corresponding offense." *State v. Yeager*, 2019 S.D. 12, ¶ 4, 925 N.W.2d 105, 108. "[W]e look to the gravity of the offense and the harshness of the penalty." *Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d at 488. Such a "comparison rarely leads to an inference of gross disproportionality and typically marks the end of our review." *Id.* However, should the penalty imposed appear to be grossly disproportionate to the gravity of the offense, we next "compare the sentence to those 'imposed on other criminals in the same jurisdiction' as well as those 'imposed for commission of the same crime in other jurisdictions.'" *Id.* (quoting *Solem v. Helm*, 463 U.S. 277, 291, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983)).

[¶56.] Snodgrass was convicted of multiple acts of rape and sexual contact with a child. Snodgrass, who was a father figure to E.M., raped her continually over several years. We have held that "[r]ape is a heinous crime, especially so when the victim is the perpetrator's child . . . without doubt deserving of serious punishment." *Yeager*, 2019 S.D. 12, ¶ 6, 925 N.W.2d at 109. Further, child rape in particular "may be devastating in [its] harm." *Id.* (quoting *Kennedy v. Louisiana*, 554 U.S. 407, 438, 128 S. Ct. 2641, 2660, 171 L. Ed. 2d 525 (2008)).

[¶57.] "In judging the gravity of an offense, a court may also consider certain past conduct of the defendant." *Chipps*, 2016 S.D. 8, ¶ 36, 874 N.W.2d at 488. Snodgrass had prior convictions for three felonies that enhanced the maximum sentences on his sexual contact convictions two levels under a habitual offender

statute. *See* SDCL 22-7-8.1. "[I]f the sentence is enhanced because of [Snodgrass's] recidivism, then the gravity of his past offenses also contributes to the gravity of the present offense[s]." *Chipps*, 2016 S.D. 8, ¶ 36, 874 N.W.2d at 488.

[¶58.]     Snodgrass has failed to show that his sentences were grossly disproportionate. "[N]o further review of [Snodgrass's] challenge on Eighth Amendment grounds is warranted." *Yeager*, 2019 S.D. 12, ¶ 10, 925 N.W.2d at 110.

[¶59.]     We affirm.

[¶60.]     GILBERTSON, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.