#30365-a-JMK
**2025 S.D. 16**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

STEVEN TUOPEH,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JAMES A. POWER
Judge

\* \* \* \*

MARK KADI
TRACY MILLER of
Minnehaha County Office
   of the Public Advocate
Sioux Falls, South Dakota                    Attorneys for defendant and
                                               appellant.

MARTY J. JACKLEY
Attorney General

JACOB R. DEMPSEY
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
                                               appellee.

\* \* \* \*

ARGUED
APRIL 25, 2024
OPINION FILED **03/12/25**

#30365

KERN, Justice

[¶1.]    Christopher Mousseaux was beaten to death during an altercation with Steven Tuopeh and Jeff Pour near the Red Sea Pub in downtown Sioux Falls. Although Tuopeh and Pour were initially charged as co-defendants, their cases were severed and Pour entered into a plea bargain agreement with the State.[1] After a trial, the jury found Tuopeh guilty of second-degree murder and first-degree manslaughter. Tuopeh appeals, arguing that the circuit court erred by failing to give Tuopeh's requested jury instructions, in denying his motion for judgment of acquittal, and in several legal and evidentiary rulings. We affirm.

**Factual and Procedural Background**

[¶2.]    In the evening hours of October 10, 2021, Steven Tuopeh and Jeff Pour, along with several other individuals, were standing around the outside entrance to the Red Sea Pub in downtown Sioux Falls.[2] At some point, they became aware of an individual in a white t-shirt—later identified as Christopher Mousseaux—approaching from the east. Several males, including Tuopeh and Pour, intercepted Mousseaux before he reached the pub entrance. Although the encounter initially seemed amicable, Mousseaux, who appeared intoxicated, started vigorously pulling up his pants, stepped forward, and then suddenly swung at

---

1.    Pour pled guilty to first-degree manslaughter and was sentenced to serve 50 years in prison.

2.    An armed security guard, Sean Tika, was also standing at the front entrance near the group. Surveillance video from the Red Sea Pub and other neighboring businesses captured much of the encounter.

Tuopeh and Pour with his right fist. Mousseaux, while still facing Tuopeh and Pour, started skipping and hopping backwards down the street, away from the pub.

[¶3.] Tuopeh and Pour followed Mousseaux for some distance and ultimately began running towards him, with Tuopeh in the lead. Once Tuopeh and Pour were closing in, Mousseaux turned his back towards his pursuers and attempted to run a few steps. However, likely due to his intoxication, he almost immediately tripped and fell. Tuopeh and Pour began punching and kicking Mousseaux as soon as he hit the pavement.[3] After delivering a brutal beating, Tuopeh and Pour walked away, leaving Mousseaux lying motionless on the ground.

[¶4.] Law enforcement eventually received reports concerning a potential stabbing or car-on-pedestrian collision in the area. Police officers responding to the scene found Mousseaux prone on the ground, in a pool of blood and vomit. Mousseaux was taken to the Avera McKennan Hospital in Sioux Falls. He died a few days later, on October 13, 2021, from the blunt force trauma inflicted on him during the beating. At the time of his arrival at the hospital, Mousseaux had a blood alcohol content of .245.

[¶5.] An autopsy performed by Dr. Kenneth Snell revealed rib and skull fractures, as well as hemorrhaging in the skull. In addition to numerous other injuries, Dr. Snell observed several lacerations[4] to Mousseaux's head: one on the upper left side of the forehead and four on the back of the head. There was also a

---

3. Surveillance video and trial testimony support the assertion that both Tuopeh and Pour punched Mousseaux.

4. Dr. Snell explained at trial that "a laceration is a tearing of the skin due to blunt force injury."

puncture wound in between two of the four lacerations on the back of his head. Beneath these lacerations were several skull fractures, including a "very complex" fracture on the front and back of Mousseaux's skull.[5] As a result of the serious head injuries Mousseaux received, his brain hemorrhaged, causing substantial swelling of brain tissue, which pushed the brain into the spinal cord canal. According to Dr. Snell, this traumatic brain injury caused Mousseaux's death, not the other injuries to his arms, legs, and ribs.

[¶6.] During the ensuing criminal investigation, detectives interviewed Pour, who acknowledged his presence at the Red Sea Pub on the night in question. However, Pour denied beating Mousseaux after he tripped and fell to the ground. Pour identified a person called "Ceano"[6] as having also been involved in the altercation with Mousseaux. Investigators were able to obtain footage of the incident from the Red Sea Pub and other neighboring establishments. One photograph appeared to show "Ceno," an African American male, holding an object comprised of two rings and a spike at the base of his fingers, prior to the confrontation with Mousseaux. Based on a Facebook profile, law enforcement officers were able to identify "Ceno" as Tuopeh. After obtaining a warrant, officers searched Tuopeh's residence and located several items of evidentiary value, including a pair of tennis shoes, matching the shoes worn by Tuopeh as depicted on

---

5. Dr. Snell testified that a complex fracture on the forehead, like the one Mousseaux suffered, would require a substantial amount of force—the equivalent of falling from a second floor or higher onto a rock.

6. In describing the suspect, Pour spelled the name "Ceano" for the investigators, however the Facebook profile and notebook used the spelling, "Ceno."

the video footage, and a pair of blue jeans with blood stains. Law enforcement also found a notebook with apparent rap lyrics written by "Ceno."

[¶7.]    A Minnehaha County grand jury jointly indicted Tuopeh and Pour on three counts: Count 1, second-degree murder (depraved mind) in violation of SDCL 22-16-7; Count 2, first-degree manslaughter (heat of passion) in violation of SDCL 22-16-15(2); and Count 3, first-degree manslaughter (dangerous weapon) in violation of SDCL 22-16-15(3).[7]  However, after Pour reached a plea bargain agreement with the State, the cases were severed. Prior to trial, Tuopeh moved for a grant of statutory immunity from criminal prosecution, pursuant to SDCL 22-18-4.8, based on his claim that he was acting in self-defense. After an immunity hearing, the circuit court determined that Tuopeh made a prima facie case of self-defense by showing that Mousseaux had thrown the first punch. However, the court determined that the State carried its burden of rebutting the prima facie case by clear and convincing evidence. The court specifically found that, at the time of the beating, Mousseaux had turned his back to run, had fallen to the ground and no longer posed an imminent threat to Tuopeh. Furthermore, the court concluded that, even if Tuopeh was justified in using force to defend himself, the use of deadly force—significant blows to Mousseaux's head—was not reasonable. As a result, the court denied Tuopeh's immunity motion.

[¶8.]    Meanwhile, on December 21, 2022, Korderro Robinson, an inmate at the Minnehaha County Jail where Pour was incarcerated, sent a letter to the State's Attorney's Office, claiming to have overheard Pour making certain

---

7.    Prior to trial, the State dismissed Count 3 of the indictment.

incriminating statements. Although Robinson and Pour were not in neighboring cells, they were in the same cell block for a period of time, as was Tuopeh. Robinson was facing an upcoming sentencing hearing in January 2023, and was pursuing sentencing concessions from the State. In a subsequent interview, Robinson told Detective Patrick Marino of the Sioux Falls Police Department (SFPD), that Pour had admitted to using brass knuckles while beating Mousseaux.[8]

[¶9.]        However, during Tuopeh's trial, Robinson, who was in the penitentiary, refused to testify, despite being served with a subpoena. The circuit court thus concluded that Robinson was unavailable to testify. Tuopeh argued that, because Robinson was an unavailable witness, his statements to Detective Marino relating what Pour had told him should be admitted under either the exception for statements against penal interest or as nonhearsay statements made by an opposing party. Nevertheless, the State noted that Robinson's recollection of Pour's admission, as related by the detective, would be double hearsay. The circuit court ultimately held that Pour was not an opposing party and that Pour's statements, while against his penal interest, were not sufficiently corroborated to establish the trustworthiness of either Pour's or Robinson's statements and were thus inadmissible.

[¶10.]        Additionally, at trial, the State sought to introduce a photograph of Tuopeh's rap lyric notebook, which contained offensive and violent lyrics, including the use of the N-word. Although the court admitted the exhibit, it instructed the

---

8.        Based on this information, it appears that Tuopeh had intended to argue that Pour alone had caused the complex fractures to Mousseaux's head and the ensuing brain trauma.

jury to only consider the notebook for purposes of identifying Tuopeh by his pseudonym of "Ceno." Finally, during closing arguments—while emphasizing that his sneakers seized from his apartment showed no blood stains—Tuopeh accused the State of trying to "sell" them on a theory that the sneakers had been cleaned. In its reply argument, the State took exception to this suggestion, responding that "I'm not a salesman. I don't sell anything. My job is justice and bringing people to justice who have committed crimes." Tuopeh objected, claiming that this statement constituted impermissible vouching, but the objection was overruled by the circuit court.

[¶11.] At the close of evidence, the court met with the parties to settle jury instructions, including Tuopeh's proposed non-pattern instructions defining speculation and conjecture, as well as his proposed alternative counts instruction. The circuit court refused these instructions, concluding that the speculation instruction was unnecessarily confusing and that the alternative counts instruction was not a correct statement of the law as it pertained to the charges and facts presented in the case. The court did grant Tuopeh's request for lesser-included offense instructions on second-degree manslaughter and simple assault. The jury found Tuopeh guilty of second-degree murder and first-degree manslaughter.

[¶12.] Prior to sentencing, Tuopeh filed a motion to vacate the first-degree manslaughter conviction, arguing that "double homicide convictions for a single death are improper" and that the second conviction constitutes impermissible punishment in violation of the double jeopardy clauses of the state and federal constitutions. The court considered the motion at a combined motion and

sentencing hearing. The State opposed the motion to vacate, but agreed that under the case law, it was not appropriate for the court to pronounce judgment and sentence on both counts. The State urged the court to enter judgment and sentence only as to Count 1, the murder count, and leave the jury's guilty verdict on Count 2, first-degree manslaughter, in place but "with no judgment of conviction, no sentence ascribed to it."

[¶13.] Although the court agreed with Tuopeh and determined that he could only have one conviction, the court said its remedy was somewhat different than either party's proposal. The court granted Tuopeh's motion and vacated Count 2, "merging" it into Count 1 and leaving a conviction only on the murder count. The court sentenced Tuopeh to life in prison without the possibility of parole on the second-degree murder conviction. Thereafter, the court entered a written judgment and sentence that first recited the jury's verdicts finding Tuopeh guilty on both counts. It then included language stating that the court "vacated the [j]ury's guilty verdict as to Count 2 [manslaughter in the first degree] and merged it into a single conviction for [murder in the second degree.]" The written judgment and sentence did not contain an express adjudication of guilt by the court on either count,[9] but did contain the court's sentence for Count 1, second-degree murder. Tuopeh appeals raising several issues which we restate as follows:

1. Whether the circuit court abused its discretion when it denied Tuopeh's proposed alternative counts instruction.

---

9. We similarly noted an absence of an express adjudication of guilt in the judgment at issue in *State v. Washington*, 2024 S.D. 64, ¶ 69, 13 N.W.3d 492, 512.

2. Whether the circuit court erred by failing to procure Robinson's attendance or admit evidence of his statements concerning Pour's alleged admission.

3. Whether the circuit court abused its discretion by overruling a vouching objection regarding the prosecutor's declaration that "my job is justice."

4. Whether the circuit court abused its discretion by overruling objections to Dr. Snell's testimony regarding certain cause of death opinions.

5. Whether the circuit court abused its discretion when it denied Tuopeh's proposed jury instructions on speculation and conjecture.

6. Whether the circuit court erred by denying Tuopeh's motion for judgment of acquittal.

7. Whether the circuit court erred by denying Tuopeh's request for statutory immunity under SDCL 22-18-4.8.

8. Whether the circuit court abused its discretion by admitting a photograph of a page from Tuopeh's notebook.

## Analysis

### 1. *Whether the circuit court abused its discretion when it denied Tuopeh's proposed alternative counts instruction.*

[¶14.] "A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard." *State v. Schumacher*, 2021 S.D. 16, ¶ 25, 956 N.W.2d 427, 433 (citation omitted). "We have defined abuse of discretion as 'discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence.'" *State v. Carter*, 2023 S.D. 67, ¶ 24, 1 N.W.3d 674, 685 (quoting *State v. Snodgrass*, 2020 S.D. 66, ¶ 25, 951 N.W.2d 792, 802). "Error in declining to apply a proposed instruction is reversible only if it is

prejudicial, and the defendant has the burden of proving any prejudice." *State v. Ortiz-Martinez*, 2023 S.D. 46, ¶ 36, 995 N.W.2d 239, 246–47 (citations omitted). "[The] jury instructions are to be considered as a whole, and if the instructions when so read correctly state the law and inform the jury, they are sufficient." *State v. Hauge*, 2013 S.D. 26, ¶ 17, 829 N.W.2d 145, 150–51 (alteration in original) (citation omitted). However, "it is axiomatic that there can be no abuse of discretion in the refusal of a proposed jury instruction that does not represent a correct statement of the law." *Id.* ¶ 18, 829 N.W.2d at 151 (quoting *State v. Janklow*, 2005 S.D. 25, ¶ 26, 693 N.W.2d 685, 695).

[¶15.] Here, Tuopeh requested the following alternative counts jury instruction, which he indicated was a modification of Criminal Pattern Jury Instruction 1-13-6:

> The defendant is charged with Murder 2nd Degree, Manslaughter 1st Degree and Manslaughter 2nd Degree. These charges are presented in the alternative and in effect allege that the defendant committed an unlawful act which constitutes either the crime of Murder 2nd Degree, Manslaughter 1st Degree, or Manslaughter 2nd Degree. If you find that the defendant committed an act or acts constituting one of the crimes so charged, you then must determine which of the offenses so charged was thereby committed.
>
> In order to find the defendant guilty, you must all agree as to the particular offense committed and, if you find the defendant guilty of one of such offenses, you must find the defendant not guilty of the others.

[¶16.] During the settling of instructions, the State objected to Tuopeh's requested instruction and contended it was not "an accurate statement of the way the charges were brought or how the law works." Tuopeh claimed the instruction was warranted because double homicide convictions for a single death are improper,

citing the constitutional prohibition against double jeopardy addressed in this Court's prior decisions, as well as in *Ball v. United States*, 470 U.S. 856, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985) and *Rutledge v. United States*, 517 U.S. 292, 116 S. Ct. 1241, 134 L. Ed. 2d 419 (1996).

[¶17.]     The circuit court denied the instruction. The court determined there were differences in the homicide counts and although it was possible that the jury could render guilty verdicts on more than one count, if that occurred, any concerns about multiple convictions could be resolved in a way to avoid running afoul of the case law cited by Tuopeh. Ultimately, the jury found Tuopeh guilty of both second-degree murder and first-degree manslaughter. Because the circuit court did not enter a conviction on the latter and sentenced Tuopeh on only the second-degree murder conviction, Tuopeh does not directly raise a double jeopardy issue on appeal. Instead, he contends the court committed reversible error warranting a new trial by not instructing the jury to consider the homicide counts in the alternative and "determine which charge had been proved, to the exclusion of the others, if any had been proved at all."

[¶18.]     We find no abuse of discretion in the court's refusal to give the requested instruction. We first note that Tuopeh's proposal incorrectly stated that second-degree manslaughter was one of three charged offenses the jury must consider. But only second-degree murder and first-degree manslaughter counts were charged in the indictment, and those were the two counts for the jury's initial consideration. At Tuopeh's request, instructions on second-degree manslaughter, as well as simple assault, were presented to the jury to potentially consider as lesser-

included offenses. Lesser-included offenses are distinct from the charged offenses and were addressed in other instructions.

[¶19.] More importantly, the jury was not required, as directed by Tuopeh's requested instruction, to consider the separately charged homicide counts in the alternative such that a finding of guilt on one charge required a finding of not guilty on the other. It is true that double jeopardy principles prohibit a defendant from being convicted and punished for more than one homicide in a single-death case. *Wilcox v. Leapley*, 488 N.W.2d 654, 657 (S.D. 1992). But Tuopeh emphasizes an additional statement in *Wilcox* urging prosecutors to charge homicide counts in the alternative to support his argument that the circuit court abused its discretion in refusing his requested instruction. However, we did not hold in *Wilcox* that an indictment which did not charge in the alternative, or that the submission of separate homicide charges to the jury without an alternative counts instruction, was error.[10] *Id.*

---

10. Tuopeh's reliance on *State v. Well*, 2000 S.D. 156, 620 N.W.2d 192, is also misplaced. The Court's rationale in *Well* for concluding the circuit court abused its discretion by not giving an alternative counts instruction was that the offenses at issue were mutually exclusive. *Id.* ¶ 21, 620 N.W.2d at 196. Such is not the case here. In 2005, our Legislature enacted SDCL 22-16-20.1 which directs that second-degree murder and manslaughter in the first and second degree are lesser-included offenses of first-degree murder. By definition, lesser-included offenses are not mutually exclusive. *See State v. McCahren*, 2016 S.D. 34, ¶ 11, 878 N.W.2d 586, 593 (noting that a "greater offense cannot be committed without also committing the lesser offense"). And contrary to Tuopeh's claim that a failure to give an alternative counts instruction warrants a new trial, this Court did not order such relief in *Well*. *See Well*, 2000 S.D. 156, ¶ 25, 620 N.W.2d at 197. Moreover, as further discussed in our analysis of this issue, our case law addressing double jeopardy claims has evolved since both *Wilcox* and *Well*.

[¶20.]     Indeed, our more recent cases addressing double jeopardy claims have recognized that the primary issue is not how multiple counts are submitted to the jury, but rather whether multiple convictions and sentences for the same act are entered for the same conduct. We have thus noted that the principles safeguarding the right to be free from double jeopardy do not preclude the prosecution from charging multiple separate counts arising from the same conduct "in order to meet the evidence which may be adduced[.]" *State v. Washington*, 2024 S.D. 64, ¶ 61, 13 N.W.3d 492, 510 (alteration in original) (citing *State v. Baker*, 440 N.W.2d 284, 293 (S.D. 1989) and *State v. Manning*, 2023 S.D. 7, ¶ 36, 985 N.W.2d 743, 755 (noting that charges of rape and sexual contact were not required to be brought in the alternative and that "[t]he State is not required to pick between two viable theories that are supported by the evidence[]")); *see* SDCL 23A-6-23; SDCL 23A-6-25. The question presented here is whether the jury may return a guilty verdict on more than one of the homicide counts arising out of the same conduct. In this regard, *Ball v. United States*, the case Tuopeh relied on before the circuit court and in this appeal, is instructive. 470 U.S. 856, 105 S. Ct. 1668.

[¶21.]     In *Ball*, the defendant, a previously convicted felon, was charged under two separate federal statutes with receiving a firearm and possessing a firearm, based on the same conduct. 470 U.S. at 856, 105 S. Ct. at 1669. A jury convicted him of both counts and he was sentenced on both. *Id.* The Supreme Court determined the legislative intent behind the two statutes indicated that Congress did not intend someone to be convicted and punished for both offenses based on the same conduct. 470 U.S. at 861, 105 S. Ct. at 1671. The remedy, according to the

Court, was to vacate one of the convictions along with its sentence. 470 U.S. at 864–65, 105 S. Ct. at 1673–74.

[¶22.] However, the Supreme Court made it clear there was no impediment to the defendant being prosecuted simultaneously for multiple charges arising from the same conduct, explaining that the Court "has long acknowledged the Government's broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case." 470 U.S. at 859, 105 S. Ct. at 1670; *see* 470 U.S. at 860 n.7, 105 S. Ct. at 1671 n.7 (noting that "the Double Jeopardy Clause imposes no prohibition to simultaneous prosecutions" on the separate statutory charges).

[¶23.] Of particular relevance to our analysis here, the Court in *Ball* did not hold that double jeopardy principles require that two charges arising from the same conduct must be submitted to the jury as alternative counts. To the contrary, the Court emphasized that while a multiple-count indictment may be brought "where a single act establishes" both offenses, the focus is on ensuring that the accused does "not suffer two convictions or sentences on that indictment." 470 U.S. at 865, 105 S. Ct. at 1673. Notably, the Court further explained, "If, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense. Should the jury return guilty verdicts for each count, however, the district judge should enter judgment on only one of the statutory offenses." 470 U.S. at 865, 105 S. Ct. at 1673–74.

[¶24.] Relying on this passage from *Ball*, we recently cited this approach with approval in *Washington*, a case involving multiple counts of aggravated assault

based on the same conduct on which the jury had entered separate guilty verdicts. However, because some of this Court's prior cases have suggested that double jeopardy concerns were not implicated by the entry of multiple convictions so long as only one *sentence* was imposed, we clarified in *Washington* that "a court violates double jeopardy when it imposes multiple convictions for a single statutory offense arising out of the same act." 2024 S.D. 64, ¶ 67, 13 N.W.3d at 512. We therefore directed that "where a guilty verdict has been rendered on multiple counts for a single statutory offense resulting from the same act, a sentencing court should include express language stating that no judgment of conviction is being entered" on the remaining count or counts at issue. *Id.* ¶ 71, 13 N.W.3d at 513.

[¶25.] In light of these decisions, the circuit court did not abuse its discretion when it denied the requested alternative counts instruction and allowed the jury to consider multiple counts of homicide and potentially render more than one guilty verdict, even though in the end it would be impermissible for Tuopeh to be convicted and punished for more than one. The court's view was correct, that at that point in time, it was unknown whether the jury would find Tuopeh guilty of more than one count. The court appropriately recognized that, if that occurred, it would need to address the potential double jeopardy concerns raised by the cases Tuopeh cited to the court, including *Ball*. When multiple guilty verdicts were rendered, the court did construct a remedy that avoided double jeopardy concerns.[11] The court's denial of Tuopeh's requested instruction was therefore not an abuse of discretion.

---

11. The court's remedy included vacating the jury's guilty verdict on manslaughter and "merging" it into the murder conviction. At the time of

(continued . . .)

-14-

[¶26.]    Nor was Tuopeh prejudiced by the lack of an alternative counts instruction. According to Tuopeh, such an instruction would have forced the jury to focus on rendering a single verdict, and he was entitled to "have the jury determine which charge had been proved, to the exclusion of others, if any had been proved at all." Tuopeh's arguments ignore the fact that, irrespective of the number of charges at issue, a jury must find that the evidence proves beyond a reasonable doubt every element of each offense alleged before it may render a guilty verdict as to that count. Here, the jury was instructed to separately consider each count and the evidence that applied to it, and further instructed that a verdict on one count must not influence the verdict on any other count. The guilty verdicts here demonstrate that the jury did in fact find that the evidence proved, beyond a reasonable doubt, that Tuopeh committed both of the charged counts.

### 2.    *Whether the circuit court erred by failing to procure Robinson's attendance or admit evidence of his statements concerning Pour's alleged admission.*

[¶27.]    Tuopeh argues that the circuit court was constitutionally obligated to compel Robinson to testify regarding Pour's alleged admission to Detective Marino that he used brass knuckles while beating Mousseaux. The circuit court here did issue a subpoena that was served on Robinson on April 6, 2023. Robinson, however, refused to leave his cell and would not come to court to testify.

---

(. . . continued)

Tuopeh's sentencing, the circuit court did not yet have the benefit of our holding and guidance set forth in *Washington*. Rather than "vacating" a jury's verdict under such circumstances, a court should instead note in the judgment that no conviction is being entered on the count or counts at issue.

[¶28.] Robinson's refusal to testify was conveyed to the court and Tuopeh's counsel on the second day of the three-day trial. The court concluded that Robinson was thus unavailable to testify under the rules of evidence. *See* SDCL 19-19-804(a)(2) (stating that a witness is unavailable when they "[r]efuse[] to testify about the subject matter despite a court order to do so"). At that juncture, Tuopeh made an offer of proof, seeking to establish that Robinson's statements to detectives concerning Pour's alleged admission that he used brass knuckles in the assault against Mousseaux would be admissible if presented at trial through Detective Marino, who took the statement. As this Court has previously observed,

> The Sixth Amendment requires that a witness be brought to court, but it does not require that he take the stand after refusing to testify. Once a witness appears in court and refuses to testify, a defendant's compulsory process rights are exhausted. It is irrelevant whether the witness's refusal is grounded in a valid Fifth Amendment privilege, an invalid privilege, or something else entirely. The defendants' Sixth Amendment rights were satisfied as soon as the [witness] appeared in court and refused to testify[.]

*State v. Crawford*, 2007 S.D. 20, ¶ 19, 729 N.W.2d 346, 350 (first alteration in original) (quoting *U.S. v. Griffin*, 66 F.3d 68, 70 (5th Cir. 1995)). Here, Robinson was already in custody and categorically refused to testify. At most, the circuit court could have compelled his presence in the courtroom, but such steps would have been manifestly futile based on the undisputed representations made to the court that Robinson adamantly refused to leave his cell to come to court to testify.[12]

---

12. The Fifth Circuit Court of Appeals has noted that a defendant is not entitled to draw the jury's attention to a missing witness' absence or refusal to testify. *See U.S. v. Griffin*, 66 F.3d 68, 71 (5th Cir. 1995). Tuopeh would thus not have been able to gain any strategic advantage by Robinson refusing to

(continued . . .)

After the court found, based upon his refusal to testify, that Robinson was unavailable, the court permitted Tuopeh to again subpoena Robinson and allow his testimony if Robinson changed his mind before the close of trial.[13]  We are thus unable to discern error in the court's prudential decision to classify Robinson as unavailable.[14]

[¶29.]       We next consider the admissibility of proffered testimony by Detective Marino relaying Robinson's statements about what Pour told him.  As an initial matter, the circuit court correctly noted that such testimony would constitute double hearsay.  However, Tuopeh argued that Robinson's statements were not

---

(. . . continued)

testify in court.  In addition, a contempt sanction would have been unlikely to succeed in this case, because Robinson was already incarcerated.

13.    The State had rested its case by this time and because the trial was expected to conclude at least two days earlier than originally scheduled, Tuopeh requested that the court continue the trial until the date that the trial was originally scheduled to conclude to allow Tuopeh additional time to subpoena Robinson and perhaps compel his testimony.  Tuopeh also suggests on appeal that the court should have directed law enforcement to forcibly bring Robinson into court, but no such request was made at trial.  Further, it is clear from the record that both parties and the court believed that Robinson was simply unwilling to testify and would not change his mind.  The circuit court's denial of the continuance request or failure to take some other action, under these circumstances, was not an abuse of discretion.

14.    As an aside, in order to obtain a continuance when a witness is absent, the defendant must demonstrate three criteria: "(1) the testimony of the absent witness is material; (2) the defendant has used due diligence to procure the attendance of the witness of his deposition; and (3) it is reasonably certain the presence of the witness or his testimony will be procured by the time to which the trial would be postponed." *State v. Letcher*, 1996 S.D. 88, ¶ 30, 552 N.W.2d 402, 407.  Even if Tuopeh moved for a continuance, which he did not, the final prong would not have been met because there was no reasonable certainty that, with the passage of additional time, Robinson would become willing to testify.

necessarily offered to "prove the truth of the matter asserted," but rather to cast doubt on the "caliber" of the criminal investigation. SDCL 19-19-801(c)(2). According to Tuopeh, law enforcement should have, but did not, follow up on the possibility that Pour used brass knuckles.

[¶30.] However, as the circuit court noted, even if this was indeed the case, it would not cast doubt on the investigation into Tuopeh's culpability. The circuit court also pointed out that, even with a limiting instruction, putting the investigation on trial would distract from the central issue before the jury: Tuopeh's guilt or innocence. It is thus difficult to conclude that testimony regarding Robinson's statements could serve a non-hearsay purpose in this regard.

[¶31.] Tuopeh also argued that the testimony was admissible under the opposing-party or against penal interest exceptions to the rule against hearsay. However, the circuit court correctly concluded that the opposing party in this case was the State. Here, the offered statement was ultimately from Pour, who is not an employee or agent of the State. Thus, the opposing-party exception does not apply. *See* SDCL 19-19-801(d)(2). When a witness is unavailable, SDCL 19-19-804 allows hearsay evidence to be introduced under certain exceptions. Specifically, SDCL 19-19-804(b)(3) permits the introduction of statements against penal interest. But, if offered in a criminal trial, such statements must be "supported by corroborating circumstances that clearly indicate . . . trustworthiness[.]" *Id.*

[¶32.] While Pour's statement to Robinson was against Pour's penal interest, the circuit court noted that this Court has "set forth several factors for a trial court to consider in assessing trustworthiness of hearsay offered under the residual

hearsay rule[.]" *State v. Cottier*, 2008 S.D. 79, ¶ 27, 755 N.W.2d 120, 131. These include:

> (1) the character of the witness for truthfulness and honesty and the availability of evidence on that question; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; (3) the relationship of the witness to the parties and any motivation the witness had for making the statement; (4) the extent to which the witness's statement reflects personal knowledge; (5) whether the witness ever recanted the statement; (6) the existence of corroborating evidence; and (7) the reasons for the unavailability of the witness.

*Id.* (citation omitted).

[¶33.] The circuit court concluded that these factors weighed against a finding of trustworthiness. First, Robinson pled guilty to a felony grand theft charge on January 27, 2023, which undermined his character for truthfulness. Second, Robinson's statements to law enforcement, while voluntary, were not under oath. Third, Robinson had no known relationship to Pour or Tuopeh, other than their contemporaneous residency at the jail. Fourth, the court found that there was credible evidence that Robinson, who was pending sentencing on a felony charge at the time he contacted the State, was seeking to "obtain better treatment for himself" thus suggesting a motive to manufacture his statements. The circuit court carefully considered Tuopeh's proffer, but in light of these findings, we are unable to conclude that the circuit court abused its discretion in declining to admit the hearsay testimony.[15]

---

15. Tuopeh also argues that he was prevented from supplementing the record on trustworthiness because Robinson, even though he was subpoenaed, refused

(continued . . .)

### 3. Whether the circuit court abused its discretion by overruling a vouching objection regarding the prosecutor's declaration that "my job is justice."

[¶34.]     At trial, Tuopeh through the cross-examination of law enforcement witnesses, emphasized the fact that the tennis shoes taken from his home during the execution of the search had no blood stains on them. In response, the State insinuated on redirect that any blood might have been removed before law enforcement searched Tuopeh's residence and seized the shoes. Tuopeh responded to this suggestion during his closing argument:

> There's no evidence, whatsoever, that the sneakers were cleaned. None. But they try to sell you with that anyway. Why would they even try to do that if it's such an open and shut case? Why do they need to suggest that the defendant cleaned them up when he could not have clean[ed] them up at all? Can't possibly be true, so why push it? I would ask that you consider, you know, if we're all getting played here a little bit by that tactic.

[¶35.]     On rebuttal, the State responded:

> In addition, the defense just said to you that I was trying to sell you something. That's not my job. I'm not a salesman. I don't sell anything. My job is justice and bringing people to justice who have committed crimes. I am not here trying to put anything over on you. I'm here to present evidence to you that shows that this defendant committed these crimes. Selling something is not what I do.

Tuopeh immediately objected on the grounds that these statements constituted impermissible vouching, but the circuit court overruled the objection.

---

(. . . continued)
    to appear. However, as previously noted, the right to compulsory process does not guarantee witness testimony.

[¶36.]  "If an issue of prosecutorial misconduct is preserved with a timely objection at trial, [this Court will] review the trial court's ruling under the standard of abuse of discretion." *State v. Hankins*, 2022 S.D. 67, ¶ 31, 982 N.W.2d 21, 32–33 (alteration in original). "This Court will find that prosecutorial misconduct has occurred if (1) there has been misconduct, and (2) the misconduct prejudiced the party as to deny the party a fair trial." *Id.* ¶ 32, 982 N.W.2d at 33. "[P]rejudice can result from the prosecution placing the prestige of the government behind the witness and implying that the prosecutor knows what the truth is and thereby assures its revelation." *State v. Nelson*, 2022 S.D. 12, ¶ 38, 970 N.W.2d 814, 826 (alteration in original) (citation omitted). "Improper vouching 'invite[s] the jury to rely on the government's assessment that the witness is testifying truthfully.'" *Manning*, 2023 S.D. 7, ¶ 38, 985 N.W.2d 743, 755 (alteration in original) (quoting *Snodgrass*, 2020 S.D. 66, ¶ 45, 951 N.W.2d at 806).

[¶37.]  As an example, Tuopeh points to *Harris v. Fluke*, where the defendant was charged with rape. 2022 S.D. 5, 969 N.W.2d 717. There, during closing arguments, the prosecutor stated:

> I thought long and hard about this case. I thought long and hard about whether or not this was a case that needed to be heard by a jury. And it's a serious allegation. I thought about the evidence, and I looked at the video, the phone report. I looked at everything and it became clear to me that Mr. Harris did take advantage of [R.K.'s] impairment; that she was incapable of consent; that he knew it; and that a jury needed to hear about it.

*Id.* at 718 n.1 (alteration in original). We determined these statements constituted improper vouching. *Id.* at 720.

[¶38.] A contextual comparison, however, reveals the State's comments here to be of a fundamentally different character than those of the prosecutor in *Harris*. In *Harris*, the prosecutor specifically appealed to her review and assessment of the evidence in deciding to bring the case to a jury. Here, the State was responding to arguments by the defense that it was trying to "sell" something to the jury. The State made no statements as to the strength or credibility of any witness or evidence, but rather focused on rejecting Tuopeh's accusation. The "my job is justice" comment, in context, was not an attempt to vouch for the credibility of a particular legal conclusion, but rather a description of the proper role of a prosecutor made in response to a defense argument. Given this context, we cannot conclude that the circuit court abused its discretion in overruling Tuopeh's objection.

> **4. Whether the circuit court abused its discretion by overruling objections to Dr. Snell's testimony regarding certain cause of death opinions.**

[¶39.] Tuopeh next argues that Dr. Snell impermissibly speculated as to the cause of Mousseaux's death at the statutory immunity hearing and during the trial. According to Tuopeh, the State invited Dr. Snell to speculate as to whether a kick from a shoe could have killed Mousseaux. In addition, Tuopeh objected to Dr. Snell's testimony regarding the amount of force necessary to cause the complex skull fractures suffered by Mousseaux. However, these arguments are without merit.

[¶40.] The questions asked of Dr. Snell during the immunity hearing were to assist the circuit court in evaluating Tuopeh's self-defense arguments. Thus, there

was no danger of a jury being led astray by any supposed speculation and the court was free to weigh the credibility of Dr. Snell's testimony. Moreover, at trial, the State did not specifically ask Dr. Snell whether a kick with a shoe could have caused Mousseaux's death. Tuopeh cites to the following exchange:

> State: Could an additional blow make [the complex fracture] worse? So, let's say that somebody fell and hit an object, and then somebody kicked that person in the head. Could that make that worse?
>
> ****
>
> Dr. Snell: The way that it would make that worse is if the blow is to the opposite side while the individual is still laying on the rock because the fall may have created the initial simple fracture, but then an impact to the back opposite corner of that could then force the head down onto that rock with sufficient force to create this punch-out type skull fracture. That would be the only way we could get that from a simple fall, if [he] had an additional injury sustained in the opposite side, shoving that further down onto that rock area.

[¶41.]     Here, Dr. Snell was not testifying as to his medical opinion regarding the cause of Mousseaux's death. Instead, he was providing context as to what factors could have caused or exacerbated the type of injuries suffered by Mousseaux. However, even if this was not the case, this Court has previously held that qualified experts are permitted to testify as to the cause of a victim's injuries and death. *See State v. Fisher*, 2011 S.D. 74, ¶ 44, 805 N.W.2d 571, 580. Thus, Dr. Snell's testimony was well within permissible bounds.

[¶42.]     Tuopeh also objected to the State asking Dr. Snell what amount of force would be necessary to cause Mousseaux's injuries. Dr. Snell responded that a hammer blow or fall from a second story onto a rock would be sufficient. Contrary

to Tuopeh's assertions, the State did not "ask[] Snell hypotheticals regarding a person falling onto a rock from a second story building." Instead, Dr. Snell, unprompted, provided this as an illustrative example of the amount of force necessary to cause the unique skull fractures suffered by Mousseaux. But even if he had asked the above referenced hypothetical, such testimony, particularly in the context of an expert witness, is generally within the reasonable scope of an expert witness's explanation of his opinion. *See id.* The circuit court did not abuse its discretion in overruling Tuopeh's objections.

### 5. *Whether the circuit court abused its discretion when it denied Tuopeh's proposed jury instructions on speculation and conjecture.*

[¶43.]     Tuopeh proposed the following alternative jury instructions as definitions for speculation and conjecture:

- Speculation is the act of making an assumption or guess based on small amount of data or none at all.

- Speculation is the art of theorizing about a matter as to which evidence is not sufficient for certain knowledge.

- Conjecture is a slight degree of credence, arising from evidence too weak or too remote to cause belief. This term applies to any evidence that is based on an estimate or a guess and is insufficient to form the basis of a conclusion.

[¶44.]     The circuit court denied these instructions, concluding that the preliminary jury instruction (No. 2), which informed the jury that their "verdict must not be based upon speculation, guess, or conjecture" was sufficient. The court reasoned that these three terms together would adequately convey their related meaning to the jurors. In addition, the court pointed out that Tuopeh's definitions could cause confusion, since it is possible to speculate even based on a substantial

amount of data. Tuopeh argues that this ruling constituted reversible error because his defense centered on presenting the State's case as based on speculation and conjecture. However, we note that, from the preliminary instructions, the jury was already on notice that their verdict "must not be based upon speculation, guess or conjecture." The court did not abuse its discretion in refusing additional definitional instructions that could have confused the jury.

### 6. *Whether the circuit court erred by denying Tuopeh's motion for judgment of acquittal.*

[¶45.] "This Court reviews 'a denial of a motion for judgment of acquittal de novo.'" *State v. Peneaux*, 2023 S.D. 15, ¶ 24, 988 N.W.2d 263, 269 (quoting *State v. Timmons*, 2022 S.D. 28, ¶ 14, 974 N.W.2d 881, 887). "[A] motion for a judgment of acquittal attacks the sufficiency of the evidence[.]" *Id.* (alterations in original). "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *State v. Frias*, 2021 S.D. 26, ¶ 21, 959 N.W.2d 62, 68). "'[T]he jury is the exclusive judge of the credibility of the witnesses and the weight of the evidence[,]' and 'this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence.'" *Id.* (alterations in original).

[¶46.] At the close of the State's case-in-chief, Tuopeh moved for a judgment of acquittal. Tuopeh specifically argued that there was insufficient evidence to conclude that any of Tuopeh's blows and kicks caused Mousseaux's death. Tuopeh also asserted that—compared to Pour—his actions did not demonstrate depraved intent sufficient for a murder conviction. The court denied Tuopeh's motion,

concluding that, even if the jury found that Tuopeh didn't forcefully strike Mousseaux's head, it could still conclude that Tuopeh's blows aided and abetted Pour in delivering the killing blows to Mousseaux. On appeal, Tuopeh argues that this ruling was error because he did not intend to assist Pour in killing Mousseaux.

[¶47.] According to SDCL 22-16-7,

> Homicide is murder in the second degree if perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person, including an unborn child.

"In order to successfully prosecute a suspect for murder under this statute, the prosecution must prove that the Defendant's conduct established that he was acting with a depraved mind." *State v. Harruff*, 2020 S.D. 4, ¶ 39, 939 N.W.2d 20, 30 (citation omitted). Tuopeh is correct that an aider or abettor must "inten[d] to promote or facilitate the commission of a crime[.]" SDCL 22-3-3. However, the evidence presented by the State at trial was sufficient for a reasonable jury to make such a finding.

[¶48.] The video evidence of the beating inflicted upon Mousseaux reveals that both Tuopeh and Pour chased Mousseaux after the altercation. After Mousseaux fell to the ground, they began raining powerful kicks and punches to his head, torso and legs, with such fatal force that Mousseaux was quickly rendered motionless. A photograph of Tuopeh at the Red Sea Pub, derived from surveillance videos taken just prior to the incident, revealed a device with two rings and a spike in Tuopeh's right hand. Dr. Snell also testified that all of the blows to Mousseaux's head would have contributed to his traumatic brain injury and resulting death. At

the very least, as the circuit court pointed out, a jury could conclude that Tuopeh's punches and kicks aided and abetted Pour's undisputed direct punches to Mousseaux's head as he laid upon the pavement. In viewing the evidence in the light most favorable to the verdict, the evidence presented was sufficient for the jury to conclude that the State proved the essential elements of second-degree murder beyond a reasonable doubt. The circuit court did not abuse its discretion in denying Tuopeh's motion for acquittal.

### 7. Whether the circuit court erred by denying Tuopeh's request for statutory immunity under SDCL 22-18-4.8.

[¶49.] As the State points out, this Court has not yet determined the appropriate standard of review for a circuit court's decision to grant or deny immunity under SDCL 22-18-4.8. However, it is a general principle that "[f]actual findings of the lower court are reviewed under the clearly erroneous standard, but once those facts have been determined, 'the application of a legal standard to those facts is a question of law reviewed de novo.'" *State v. Heney*, 2013 S.D. 77, ¶ 8, 839 N.W.2d 558, 561–62 (quoting *State v. Hess*, 2004 S.D. 60, ¶ 9, 680 N.W.2d 314, 319). SDCL 22-18-4.8 provides that "[i]n a criminal prosecution, once a prima facie claim of self-defense immunity has been raised by the defendant, the burden of proof, by clear and convincing evidence, is on the party seeking to overcome the immunity from criminal prosecution provided for in this section." We will apply de novo review to the application of this legal standard to the facts before the circuit court.

[¶50.] Here, before trial, Tuopeh moved for immunity from prosecution under SDCL 22-18-4.8. At a hearing on April 4, 2023, the circuit court concluded that

Tuopeh had raised a prima facie claim of self-defense by showing that Mousseaux was the initial aggressor. After Tuopeh called Dr. Snell and Detective Marino as witnesses, the State did not provide any additional testimony and rested, relying on the video evidence that was introduced into evidence and Detective Marino's testimony.

[¶51.] The circuit court held that the State had met its burden to overcome the initial claim of self-defense. The court found that, after the first punch, Mousseaux had performed a "tactical retreat" and attempted to run away from Tuopeh and Pour. At this point, the court held that it was not reasonable for Tuopeh and Pour to view Mousseaux as an ongoing threat. Next, the court reasoned that, even if Tuopeh and Pour were acting in self-defense, their use of deadly force—repeated punches and kicks to Mousseaux's head—was not justified because Mousseaux had not engaged in a forcible felony pursuant to SDCL 22-18-4.1.

[¶52.] The court also pointed out that, based on a theory of aiding and abetting, both Tuopeh and Pour "certainly contributed to Mr. Mousseaux's inability to [d]odge the blows or to fight back." The court concluded that "at a minimum, Mr. Tuopeh, at a time when he didn't have the right to use deadly force, at least aided and abetted in the administration of deadly force to Mr. Mousseaux" by participating in the beating. Based on this reasoning, the court denied Tuopeh's motion for immunity.

[¶53.] After our review of the record and the video, we are unable to conclude that the circuit court erred in this instance. The video shows that Tuopeh and Pour

continued to pursue Mousseaux, even after he turned to run away. Once Mousseaux fell to the ground, it was not reasonable for Tuopeh and Pour to treat him as an ongoing threat. In addition, the amount of force used in beating Mousseaux, as both Tuopeh and Pour savagely punched and kicked him while he was defenseless on the ground, was not reasonable. So fierce was the attack that Tuopeh and Pour administered the killing blows to Mousseaux in less than 30 seconds. Tuopeh aided and abetted in the use of deadly force when he had no lawful reason to do so. We conclude that the circuit court properly denied Tuopeh's motion for immunity.

### 8. Whether the circuit court erred by admitting a photograph of a page from Tuopeh's notebook.

[¶54.] "Our standard of review for evidentiary rulings 'requires a two-step process: first, to determine whether the trial court abused its discretion in making an evidentiary ruling; and second, whether this error was a prejudicial error that in all probability affected the jury's conclusion.'" *Hankins*, 2022 S.D. 67, ¶ 20, 982 N.W.2d at 30 (citation omitted). "The trial court['s] evidentiary rulings are presumed to be correct." *Id.* (alteration in original) (citation omitted).

[¶55.] During the trial, the State sought to enter a photograph of a notebook containing offensive rap lyrics that included the N-word and were of a violent nature. The State ostensibly sought to enter the page from the notebook—which was found in Tuopeh's apartment—for identification purposes, because it contained the pseudonym of "Ceno." The court overruled Tuopeh's objection but instructed the jury to only consider the notebook as identification evidence, and not for its content.

[¶56.] On appeal, Tuopeh argues that admission of the notebook photograph was in error because his identity was not at issue and also because of the prejudicial nature of the lyrics. However, at trial, the State did have the burden to connect Tuopeh to the scene of the crime. Initially, Pour had referred to Tuopeh only as "Ceno" and the notebook thus served as evidence tying this pseudonym to Tuopeh. Nevertheless, the violent and insulting lyrics did paint Tuopeh in a negative light and may have suggested a propensity for violence. However, there was no request to redact any portion of the exhibit and the court gave the jury a limiting instruction at the time it was received. Under these circumstances, we do not find the court abused its discretion in admitting the notebook.[16]

[¶57.] Further, we conclude that any error in receiving the entire notebook with the lyrics was not prejudicial. Juries are presumed to follow the law set forth in the court's instructions. *See State v. Shelton*, 2021 S.D. 22, ¶ 30, 958 N.W.2d 721, 731. The jury was faced with substantial video evidence and testimony of Tuopeh's guilt. We are thus not convinced that there is a reasonable probability that, in the absence of the photograph, the jury would have more likely than not come to a different conclusion.

---

16. The exhibit was offered through the testimony of Aidan Mullaney, a forensic specialist for the SFPD. When it was admitted, the circuit court told the jury: "And this is the item I wanted to give you a limiting instruction on. That photo displayed contents of the letter. I've determined those contents are both hearsay and irrelevant, so the only purpose for which you may consider that exhibit is the fact that it shows those documents were found in the defendant's house. One document addressed to Ceno, one document addressed to Steven Tuopeh. It's limited to the purpose of identification. You're not to consider the contents of the letters displayed there."

## Conclusion

[¶58.] Based on our review of the record and the analysis set forth above, we conclude that the circuit court did not err in denying Tuopeh's request for statutory immunity prior to trial. Further, the court did not abuse its discretion in the formulation of the jury instructions or in the challenged evidentiary rulings it made throughout the trial. In viewing the evidence in the light most favorable to the verdict there was sufficient evidence for a jury to conclude that the State proved the elements of second-degree murder. Accordingly, the circuit court did not err by denying Tuopeh's motion for acquittal. We affirm.

[¶59.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.